In re REVLON, INC.
SHAREHOLDERS
LITIGATION.

C.A. No. 4578–VCL.

Court of Chancery of Delaware.

Submitted: March 5, 2010.
Decided: March 16, 2010.

Robert M. Kornreich and Carl L. Stine, Wolf Popper, LLP, New York City, Plaintiffs' Co–Lead Counsel and Members of Plaintiffs' Committee of the Whole; Joseph A. Rosenthal and Norman M. Monhait, Rosenthal, Monhait & Goddess, P.A., Wilmington, DE, Plaintiffs' Delaware Liaison Counsel and Member of Plaintiffs' Committee of the Whole; Abbey Spanier Rodd & Abrams, LLP, New York City; Glancy Binkow & Goldberg, LLP, Los Angeles, CA; Wolf Haldenstein Adler Freeman & Herz, LLP, New York City; Law Office of Jacob Fogel, P.C., Brooklyn, NY; Chimicles & Tikellis, LLP, Wilmington, DE; Law Office of Bruce G. Murphy, Vero Beach, FL, Members of Plaintiffs' Committee of the Whole.

David A. Jenkins and Michele C. Gott, Smith Katzenstein & Furlow, LLP, Wilmington, DE; Curtis V. Trinko, Law Offices of Curtis V. Trinko, LLP, New York City; Samuel K. Rosen, Harwood Feffer, LLP, New York City, for Plaintiffs Edward S. Gutman and Lawrence Corneck.

Thomas J. Allingham, II, Robert S. Saunders, Alyssa M. Schwartz, Skadden, Arps, Slate, Meagher & Flom, LLP, Wilmington, DE, for Defendants Alan T. Ennis, David L. Kennedy, and Revlon, Inc.

Andre G. Bouchard, Joel Friedlander, and Sean M. Brennecke, Bouchard Margules & Friedlander, P.A., Wilmington, DE; William Savitt and Ryan A. McLeod, Wachtell, Lipton, Rosen & Katz, New York City, for Defendants Ronald O. Perelman, Barry F. Schwartz, and MacAndrews & Forbes Holdings Inc.

Raymond J. DiCamillo and Kevin M. Gallagher, Richards Layton & Finger, P.A., Wilmington, DE; Lawrence J. Zweifach and Marshall R. King, Gibson, Dunn & Crutcher, LLP, New York City, for

Seth D. Rigrodsky and Brian D. Long, Rigrodsky & Long, P.A., Wilmington, DE;

Defendants Alan S. Bernikow, Paul J. Bohan, Meyer Feldberg, Ann D. Jordan, Debra L. Lee, Tamara Mellon, Kathi P. Seifert and Kenneth L. Wolfe.

## OPINION

LASTER, Vice Chancellor.

After filing two additional representative actions challenging a transaction that already was the subject of this proceeding, the new plaintiffs and their counsel asked me to revisit the leadership structure governing the various law firms representing the putative class. Having reviewed the record in the case to date, I conclude that the original plaintiffs' counsel failed to litigate the case adequately. Indeed, their advocacy has been non-existent. The memorandum of understanding to which they agreed raises serious questions about whether they focused foremost on the interests of the class, or instead settled on terms that would be easy gives for the defendants while still arguably sufficient to support a release and a fee. Factual representations in the memorandum of understanding appear inaccurate. When the defendants later wanted to amend a non-waivable majority-of-the-minority condition to effect a *de facto* waiver, original plaintiffs' counsel readily signed off. Then, when forced to defend their conduct and leadership role, original plaintiffs' counsel approached the concept of candor to the tribunal as if attempting to sell me a used car. Taken as a whole, their actions have undermined my confidence in their ability to provide adequate representation going forward. I am therefore replacing them with new lead counsel.

## I. FACTUAL BACKGROUND

The record for purposes of this decision is relatively limited, largely because original plaintiffs' counsel never actually litigated. The competing plaintiffs' factions have submitted briefing on the request to revise the leadership structure, including two affidavits from Robert M. Kornreich of Wolf Popper LLP. The defendants say they take no position on the dispute, but their body language suggests they would like to see original plaintiffs' counsel, who served up the settlement, remain in control of the case. I have reviewed all of the docket entries in each of the representative actions. I also have reviewed public filings made by the defendants in connection with the transaction that is the subject of the litigation. I regard this record as fully adequate to assess the performance to date of original plaintiffs' counsel. My comments on the settlement are necessarily preliminary, because confirmatory discovery has not yet taken place, and the settlement has not been formally presented to me for approval.

### A. Revlon's Controlling Stockholder Proposes A Merger.

On April 13, 2009, MacAndrews & Forbes Holdings Inc. ("MacAndrews & Forbes") submitted a written proposal to Revlon, Inc. for a merger that would result in MacAndrews & Forbes acquiring 100% of Revlon's publicly traded Class A Common Stock. The public stockholders would not receive cash. They instead would receive a new Series A Preferred Stock, whose terms I describe below. The Series A Preferred would not be listed on any securities exchange. In connection with the merger, MacAndrews & Forbes would modify the terms of a $170 million Senior Subordinated Term Loan between Revlon's operating subsidiary (as borrower) and MacAndrews & Forbes (as lender) (the "Senior Subordinated Term Loan") and contribute a portion of the loan to Revlon. The loan was scheduled to mature in August 2010. Revlon's public filings state that liquidity issues resulting

from the Senior Subordinated Term Loan provided the impetus for the transaction. I will refer to this proposal as the "Original Merger."

MacAndrews & Forbes is Revlon's controlling stockholder. Prior to the events giving rise to this litigation, Revlon had two classes of stock outstanding. Revlon's Class A Common Stock was (and remains) listed on the New York Stock Exchange. Revlon had issued 48,250,163 shares of Class A Common, of which 20,042,428 were owned by the public and the balance by MacAndrews & Forbes (directly or through affiliates). Revlon had issued 3,125,000 shares of Class B Common, all owned by MacAndrews & Forbes. As a result of its equity ownership, MacAndrews & Forbes controlled 75% of Revlon's voting power.

The board of directors of Revlon (the "Board") consists of four representatives of MacAndrews & Forbes and eight directors whom Revlon describes as independent under the NYSE listing standards. I need not evaluate their independence for purposes of this motion, and I will refer to the eight as the "Outside Directors." On April 20, 2009, the Board decided to form a special committee to evaluate and negotiate the proposal for the Original Merger (the "Special Committee"). It was populated with five of the Outside Directors. Also on April 20, Revlon issued a press release announcing the receipt of the Original Merger.

## B. Four Representative Actions Are Promptly Filed.

During the three weeks following the announcement of the Original Merger, four representative actions were filed by familiar repeat players who regularly bring representative actions on behalf of stockholders with small ownership stakes.[1] The number of actions and pace of filing were noteworthy only because similar announcements of controlling stockholder transactions historically have triggered more numerous filings within a much shorter period. As this Court has previously observed, the first cases often appear minutes or hours after the announcement with others following within a matter of days.[2] But although the four complaints in this case were filed on a marginally more moderate schedule, the work product did not reflect any noticeable improvement in quality.

First to arrive, on April 24, 2009, was a complaint styled *Mercier v. Perelman*, C.A. No. 4532, 2009 WL 1136812 (Del. Ch.).[3] Filed by Rosenthal, Monhait &

---

1. I characterize certain law firms as frequent filers based on my personal experience, which happily accords with an empirical analysis of the plaintiffs' firms who file most frequently in the Court of Chancery. *See* Robert B. Thompson & Randall S. Thomas, *The New Look of Shareholder Litigation; Acquisition–Oriented Class Actions*, 57 Vand. L.Rev. 133, 186–87 (2004) (identifying firms and number of representative actions filed during a two-year period).

2. *See, e.g., In re Cox Comm'ns, Inc.*, 879 A.2d 604, 608 (Del.Ch.2005) (describing the "hastily-filed, first-day complaints that serve no purpose other than for a particular law firm and its client to get into the medal round of

the filing speed (also formerly known as the lead counsel selection) Olympics"); *TCW Technology Ltd. P'ship v. Intermedia Comm'ns, Inc.*, 2000 WL 1654504, at *3 (Del. Ch. Oct.17, 2000) ("Too often judges of this Court face complaints filed hastily, minutes or hours after a transaction is announced, based on snippets from the print or electronic media. Such pleadings are remarkable, but only because of the speed with which they are filed in reaction to an announced transaction").

3. Albeit not yet counted among quasi-mythical figures like Harry Lewis or Alan Russell Kahn, Vern Mercier has been carving out a role for himself as stockholder champion. He appeared in 2006 as the named plaintiff in

Goddess, P.A., it was a cursory 13–page effort that largely quoted from Revlon public filings and advanced the generic theory that MacAndrews & Forbes was trying to capture the benefits of an internal Revlon restructuring before they were recognized by the market. The complaint listed two firms as co-counsel: Abbey Spanier Rodd & Abrams, LLP of New York, New York, a frequent filer in this Court, and Glancy & Binkow LLP of Los Angeles, California, a firm that appears on only one prior decision, *see In re Affiliated Computer Services, Inc. S'holders Litig.,* 2009 WL 296078 (Del.Ch. Feb. 6, 2009).

Eight days after the *Mercier* filing, on May 1, 2009, the Rosenthal firm filed a second complaint. Styled *Jurkowitz v. Perelman,* C.A. No. 4557, 2009 WL 1265814 (Del.Ch.), it was a 12-page effort not substantively distinguishable from the *Mercier* complaint. The Rosenthal firm's co-counsel in this action was Wolf Popper LLP of New York, New York, another frequent filer.

On May 5, 2009, Chimicles & Tikellis LLP joined the party with a 14–page pleading styled *Lefkowitz v. Perelman,* C.A. No. 4563, 2009 WL 1269437 (Del. Ch.). Chimicles & Tikellis' co-counsel was Wolf Haldenstein Adler Freeman Herz of New York, New York, also a frequent filer, and the Law Office of Jacob Fogel, P.C. of Brooklyn, New York, an apparent Delaware neophyte. Despite the additional time since the Original Merger was announced and the involvement of three different firms, the complaint was not substantively distinguishable from either Rosenthal complaint.

On May 12, 2009, Rigrodsky & Long LLP filed a complaint styled *Heiser v. Revlon, Inc.,* C.A. No. 4578, 2009 WL 1360064 (Del.Ch.). Rigrodsky & Long's co-counsel was the Law Offices of Bruce G. Murphy of Vero Beach, Florida, also a Delaware first-timer. Weighing in at 14 pages, it was not substantively distinguishable from any of the prior three complaints.

A brief struggle then ensued for control of the litigation. Chimicles & Tikellis and Wolf Haldenstein moved to have the four cases consolidated with Lefkowitz as the named plaintiff and themselves as co-lead counsel. Their motion claimed that their 14–page complaint demonstrated "an extensive pre-suit investigation by Plaintiff Lefkowitz and her counsel." That was a stretch.

In response to the Chimicles and Wolf Haldenstein motion, the Rosenthal firm and Rigrodsky & Long joined forces. They cross moved to have the four cases consolidated with Heiser and Jurkowitz as named plaintiffs and themselves and Wolf Popper in leadership roles. In a strange twist, the Rosenthal firm attacked not only Lefkowitz but also its own client Mercier. After arguing that Heiser and Jurkowitz owned the most shares, the cross motion stated: "Movants understand that plaintiff Mercier owns 43 shares of Revlon common stock and plaintiff Lefkowitz owns even less." I would expect the Rosenthal firm to know exactly how many shares Mercier held, having filed C.A. No. 4532 on his

---

*Mercier v. Inter–Tel, Incorporated, C.A. No. 2226–VCS, a case that led to Vice Chancellor Strine's decision in* Mercier v. Inter–Tel (Delaware), Inc., *929 A.2d 786 (Del.Ch.2007). In 2008, he was the named plaintiff in* Mercier v. Yahoo!, *C.A. No. 3579–CC, 2008 WL 749415 (Del.Ch.), an action that was consolidated with* In re Yahoo! Shareholders Litigation, *C.A. No. 3561–CC, 2008 WL 2268354 (Del.Ch.). An institution served as lead plaintiff in the consolidated* Yahoo! *case. Outside of Delaware, he served as the named plaintiff in* Mercier v. Blankenship, *662 F.Supp.2d 562 (S.D.W.Va.2009). None of the other individuals who filed actions as named plaintiffs appear to have a prior history in that role.*

behalf. I take this comment as additional evidence of the care with which this case has been litigated. None of the named plaintiffs in fact held a significant stake.

By letter dated May 29, 2009, Chancellor Chandler (to whom the case was then-assigned) put an end to the squabbling:

I have the cross-motions to consolidate and appoint lead counsel in the above cases. Because I am unpersuaded by either motion, I will not grant any motion to consolidate or appoint lead counsel. I strongly urge you to make further attempts to resolve this dispute in a manner that will enable the cases to be prosecuted efficiently.

IT IS SO ORDERED.

Within two weeks, the plaintiffs had agreed on a form of consolidation order establishing a leadership structure.

Under the plaintiffs' agreed-upon structure, everyone had a role. All of the law firms who filed complaints as Delaware counsel or forwarding counsel were designated as the Plaintiffs' Committee of the Whole. Wolf Popper and Rigrodsky & Long were appointed Co–Lead Counsel. The Rosenthal firm was appointed Delaware Liaison Counsel. I will refer to these firms collectively as "Old Counsel." The proposed form of order designated the *Heiser* action as the operative consolidated action. The Rosenthal firm represented to Chancellor Chandler that the leadership structure was agreed upon and unopposed by the defendants. As is customary when such a representation is made, Chancellor Chandler entered the consolidation order.

## C. No One Litigates Anything.

Firms who are early filers are frequently early settlers, leading some wags in the

defense bar to label them "Pilgrims."[4] This case would follow form.

Although having a leadership structure in place gave Old Counsel the authority to go forward and litigate the consolidated action, no one actually litigated anything. The next item on the docket after the June 24, 2009, consolidation order is an August 14, 2009, letter advising the Court that the parties had entered into a memorandum of understanding ("MOU").

Old Counsel did not even bother to serve discovery. Back on May 4, 2009, the Rosenthal firm served a document request in the *Mercier* action and another in the *Jurkowitz* action. On May 19, Rigrodsky & Long served a document request in the *Heiser* action. Chimicles & Tikellis never served a request in the *Lefkowitz* action. When the cases were consolidated into the *Heiser* action, the *Heiser* complaint was designated as the operative complaint and the *Heiser* document request was designated as the operative document request. The defendants never responded to the complaint. They also never responded to the document request. There is no indication that the plaintiffs ever sought a response. They also did not serve interrogatories or any other discovery requests. I regard the initial document requests as symbolic totems that the then-competing plaintiffs' firms could point to when jousting over control of the litigation. None of the Old Counsel firms appears to have intended to use its request to get documents.

Knowledgeable readers will by this time have recognized the opening steps in the *Cox Communications* Kabuki dance. A controller made a merger proposal. A series of actions were filed with a brief flurry of activity until the leadership struc-

---

4. Empirical evidence again supports this experiential insight. Professors Thompson and Thomas found that lawsuits brought by their list of frequent filers "settle more quickly on average than suits filed by other attorneys." Thompson & Thomas, *supra,* at 186.

ture was settled. Real litigation activity then ceased. With repeat players in place, events were set to unfold on cue.

### D. Along The Transactional Track, The Original Merger Morphs Into The Exchange Offer.

The *Cox Communications* ritual involves two tracks. While Old Counsel did nothing along the litigation track, MacAndrews & Forbes and the Special Committee were moving forward along the transactional track. In May 2009, the Special Committee hired Gibson Dunn & Crutcher LLP as its legal advisor and Barclays Capital Inc. as its financial advisor. On May 6, 2009, the Special Committee was formally constituted by resolution with a mandate to evaluate the Original Merger, negotiate its terms, and recommend to the Board whether or not to proceed.

During May 2009, the Special Committee and its advisors undertook these tasks. Under the MacAndrews & Forbes proposal, the Class A stockholders would receive shares of the unlisted Series A Preferred in exchange for their publicly traded shares. As originally proposed, each share of the Series A Preferred would (a) carry a liquidation preference of $3.74 per share, (b) pay quarterly cash dividends equal to 12.5% of the liquidation preference per year, (c) be entitled to mandatory redemption four years after issuance at a price equal to the liquidation preference plus accrued but unpaid dividends, (d) be entitled a contingent payment if a sale of Revlon was consummated within certain parameters not later than two years after the merger, (e) receive $1 if a sale of Revlon was not consummated within two years, and (e) carry voting rights comparable to the Class A Common but without the right to vote on any merger, combination or similar transaction (subject to certain exceptions).

After conducting diligence and attempting to value the Series A Preferred, Barclays expressed concern about the Original Proposal. On May 22, 2009, the Special Committee conveyed Barclays' concerns to MacAndrews & Forbes and expressed a strong preference for an all-cash transaction. On May 26, MacAndrews & Forbes stood firm on its proposed transaction structure, but offered to raise the dividend on the Series A Preferred from 12.5% to 12.75% and increase the liquidation preference from $3.71 to $4.75 per share. In return for these changes, the Series A Preferred no longer would entitle the holder to a contingent payment in the event of a sale of the company or a $1.00 per share special dividend in the event no change of control was consummated within two years.

On May 28, 2009, in a development one would expect to have piqued the interest of a properly motivated plaintiffs' lawyer, Barclays indicated that it would *not* be able to render a fairness opinion for the Original Merger, either under the initial terms or as improved on May 26. Later that day, the Special Committee advised MacAndrews & Forbes that the Special Committee could not recommend either alternative.

Meanwhile, starting on May 27, 2009, Gibson Dunn and Wachtell Lipton Rosen & Katz, counsel to MacAndrews & Forbes, began discussing how MacAndrews & Forbes might proceed without the bothersome impediment of the Special Committee and its uncooperative financial advisor. They hit upon the idea of Revlon launching a tender offer in which Class A holders could exchange their shares for the same Series A Preferred on which Barclays had been unable to opine and that the Special Committee had been unable to recommend. I refer to this transaction as the "Exchange Offer."

On June 1, 2009, Gibson Dunn informed the Special Committee of the new proposal. Gibson Dunn advised the Special Committee that the Exchange Offer would be presented for consideration by the entire Board, and not by the Special Committee. The Special Committee declared its work complete and disbanded.

It was now up to the full Board to consider the Exchange Offer. The Outside Directors decided they would like Gibson Dunn to continue representing them. They decided that Barclays' assistance was no longer needed. No other financial advisor was retained. According to the Schedule TO, the Outside Directors believed they could not obtain a fairness opinion for the Exchange Offer.

Between June 10 and July 22, 2009, MacAndrews & Forbes and Revlon negotiated the terms of the Exchange Offer. It was agreed that the Series A Preferred would have the same terms contemplated for the Original Merger but would pay a dividend of 12.75%. Other terms of the transaction were also negotiated, including protective provisions for non-tendering stockholders that were memorialized in a Contribution and Stockholder Agreement (the "Stockholder Agreement"). The parties also negotiated changes to the Senior Subordinated Term Loan.

All of this happened *before* the leadership structure for the plaintiffs counsel was determined by the consolidation order entered on June 24, 2009. Yet as I will describe below, the memorandum of understanding and the parties' filings loudly credit plaintiffs' counsel with a meaningful role in restructuring the Original Merger as the Exchange Offer.

On July 29, 2009, the Board authorized Revlon to proceed with the Exchange Offer. The Board declined to make any recommendation to the Class A stockholders on whether or not to tender their shares.

## E. The Litigation Track Restarts, And The Parties Enter Into The MOU.

According to the *Cox Communications* ritual, once the corporation and the controller reach unofficial agreement on the terms of a transaction, the plaintiffs are brought in to bless the deal. The transaction thus provides the consideration for a settlement, the payment of an attorneys' fee award, and a broad, transaction-wide release for all defendants.

Here, the parties followed the traditional choreography, but with one embellishment. Rather than signing off on exactly the same deal that Revlon and MacAndrews & Forbes agreed to, Old Counsel obtained minor tweaks to the transaction. Frequent filers like the firms in this case have perfected this technique as a basis for settling cases challenging third-party deals, where a transaction is typically announced after a merger agreement has been executed. A classic example of a transactional tweak is to lower the termination fee, which is a contingent aspect of a transaction that only becomes operative in the event of a topping bid. Lowering the termination fee and supplemental disclosures provide a particularly convenient way to settle litigation over a deal that already has been exposed to the market for some time, by which point it is relatively clear to the parties that an interloper is unlikely to appear.

Here, the settlement technology used in third-party deals was applied to the *Cox Communications* scenario. Revlon's Schedule TO discloses that "[f]rom time to time commencing in late July 2009, counsel for Revlon, the [Outside] Directors, and MacAndrews & Forbes had discussions with counsel for parties in the Delaware actions ... regarding certain potential changes in the proposed transaction in the

context of settling the litigation. . . ." The Schedule TO further recounts that "[c]ertain changes to the structure of the transaction were agreed during daily discussions during the week of August 3, 2009, at the request of Plaintiffs' counsel."

The changes that Old Counsel obtained were three. First, the special dividend payable to holders of the Series A Preferred in the event there was no change of control within two years was increased from $1.00 to $1.50. Whether there would be a change of control would remain entirely up to MacAndrews & Forbes.

Second, the change of control payment was modified so that at the end of the second year, if a change in control had not taken place, the holders of Series A Preferred could waive their entitlement to a special dividend of $1.50 per share and opt to convert their Series A Preferred into a new Series B Preferred. The new Series B Preferred would offer the contingent change in control payment for another year, with the amount capped at $12.50 instead of $12. The original change of control payment was structured to give the holders of the Series A Preferred their proportionate share of any amount over approximately $240 million of equity value generated from a sale of Revlon during the two years following the Exchange Offer, up to a total value of $617 million. The original cap yielded total payments per share to the Series A Preferred of $12, inclusive of its liquidation preference and any unpaid dividends. Old Counsel thus obtained an extra slice of value *if* MacAndrews & Forbes signed off on a change of control during the third year and *if* the equity value provided by the transaction exceeded $617 million. If both events occurred, then the holders of Series A Preferred who opted to give up their special dividend of $1.50 per share and exchange their Series A Preferred for Series B Pre-

ferred at the end of year two could receive another 50 cents of their proportionate share of transaction consideration, if it was available.

Third, MacAndrews & Forbes agreed that if enough shares were tendered in the Exchange Offer such that MacAndrews & Forbes could eliminate the remaining holders of Class A Common through a short-form merger, then the squeezed-out Class A stockholders would receive securities in the surviving corporation substantially identical to the Series A Preferred.

The first two events were contingent and only would become operative based on variables subject to MacAndrews & Forbes control. The third element is required by *Cox Communications* and other Delaware cases to render a controlling stockholder tender offer non-coercive. I am confident the defendants would have put it in anyway, just as they initially included the *Cox Communications* requirement that a controlling stockholder tender offer be conditioned upon tenders from a majority of the outstanding unaffiliated shares. Old Counsel also obtained the right to review and comment on Revlon's public filings in connection with the Exchange Offer.

On August 10, 2009, the changes were presented to the Outside Directors. According to the Schedule TO, "none of the [Outside] Directors raised any objections to proceeding with the Exchange Offer as previously approved and as revised to reflect the discussions with the Plaintiffs' Counsel." There is no reference in the Schedule TO to the Board actually approving the changes, which logically would have been required had the changes been material.

Based on the changes, the parties agreed to the MOU that was submitted to the Court on August 14, 2009. As is customary, the MOU was not merely a settle-

ment document, but also contained recitations of fact. In making arguments to me about how this case should proceed, both Old Counsel and defense counsel have relied on the recitations of fact in the MOU.

Unfortunately, the MOU contains a number of recitations that appear, at best, to exaggerate the contributions of Old Counsel. The MOU recites that "during the months of June 2009 and July 2009, co-lead counsel for Plaintiffs in the Delaware Actions ('Delaware Lead Counsel') had numerous discussions with counsel for Defendants concerning the status of the Proposal and the negotiations thereon." This is contrary to the Schedule TO, which states that the discussion occurred "[f]rom time to time commencing in late July 2009."

The MOU further recites the following:

[O]n July 22, 2009, Delaware Lead Counsel met with counsel for Defendants concerning a potential resolution of the Actions, at which meeting counsel discussed certain modifications to the Proposal being negotiated with MacAndrews & Forbes[.]

[F]ollowing the July 22, 2009 meeting, Delaware Lead Counsel and counsel for Defendants continued arms'-length negotiations concerning a potential resolution of the Delaware Actions on the terms set forth herein, certain of which terms reflect improvements in the terms agreed to with MacAndrews & Forbes. In connection therewith, following the July 22, 2209 [sic] meeting, Defendants provided drafts of the Exchange Offer, the banker book of the Special Committee's financial advisor, Barclays Capital Inc. ("Barclays"), and a draft of the Schedule TO/13E–3.

The Schedule TO fails to mention these meetings. According to the Schedule TO, the changes to the Exchange Offer were "agreed during daily discussions during

the week of August 3, 2009, at the request of Plaintiffs' counsel."

In another case, inconsistencies of this nature might be overlooked. But here they appear to be part of a pattern in which each of the MOU's departures from the Schedule TO serves to enhance the significance of the role played by Old Counsel. With Old Counsel having bargained for the right to review and comment on the Schedule TO, and with defense counsel's transactional colleagues controlling the document, the parties were well situated to ensure that both the MOU and the Schedule TO were accurate. Confirmatory discovery will determine whether the accounts can be reconciled.

Leaving aside these inconsistencies, the recitals to the MOU indicate that Old Counsel proposed terms for settling the litigation *before* receiving "drafts of the Exchange Offer, the banker book of the Special Committee's financial advisor, Barclays Capital Inc. ('Barclays'), and a draft of the Schedule TO/13E–3." The docket establishes that at the time, Old Counsel had done nothing whatsoever to prosecute the case. Old Counsel admitted at oral argument that at the time of the July 22, 2009 meeting, when the MOU suggests that Old Counsel proposed settlement terms, Old Counsel only had publicly available information.

Next, the first paragraph of the MOU identifies as the primary basis for the settlement that "[i]n lieu of the transactions contemplated by the Proposal, Revlon stockholders will have the opportunity to participate in an exchange offer." MOU ¶ 1. It appears on this preliminary record that the shift to the Exchange Offer had nothing to do with the litigation efforts of Old Counsel. It resulted from Barclays' refusal to render a fairness opinion and the Special Committee's consequential unwillingness to recommend the Original

Merger. Yet in the very next paragraph of the MOU, MacAndrews & Forbes "acknowledges that the pendency of the Delaware actions was a *substantial contributing factor* in its decision to pursue the Revised Transaction in lieu of the transactions contemplated in the Proposal." MOU ¶ 2 (emphasis added). I question the accuracy of these statements, which appear designed to lead the Court to believe that Old Counsel played a "substantial" role in changes that seem to have had very little to do with Old Counsel. This is another issue that I will resolve after confirmatory discovery.

Other aspects of the MOU raise further questions. Old Counsel claims to have determined that "[the settlement] terms are fair, reasonable and adequate and in the best interests of Revlon's stockholders as well as Revlon." MOU at 5. Old Counsel thus apparently concluded that the terms of the Series A Preferred were fair, even though Barclays declined to render a fairness opinion on the Series A Preferred when it appeared as part the Original Merger, even though the Special Committee declined to recommend the Original Merger, and even though the Revlon Board courageously declined to make a recommendation to stockholders as to whether to tender their shares.

The MOU also contains the following representations regarding actions taken by Old Counsel prior to reaching their fairness determination and entering into the MOU:

> ... [C]ounsel for Plaintiffs engaged in an investigation of the claims asserted in the Delaware Action, including among other things, a review of news articles,

analyst reports, SEC filings, other publicly available documents, and confidential documents provided by Defendants, including drafts of the Exchange Offer, the Barclays banker book, and a draft of the Schedule TO/13E–3. Delaware Lead Counsel retained and consulted with their financial advisor with respect to an evaluation of the Proposal, the confidential documents provided by Defendants, and the potential settlement of the Delaware Actions.

> ... [C]ounsel for Plaintiffs in the Delaware Actions have determined that, on the basis of information available to them, including publicly available information, confidential information provided by Defendants, and consultations with an independent financial advisor retained by Delaware Lead Counsel, and subject to the additional discovery described below is [*sic*] fair, reasonable, adequate, and in the best interests of Plaintiffs and the Class (as defined herein).[5]

I am quite interested in the particulars of the "investigation," the consultation with the financial advisor, and the basis for the fairness determination made by Old Counsel.

### F. The Class A Stockholders Reject Their Representatives' Handiwork.

As noted, Old Counsel ostensibly determined, prior to entering into the MOU, that the Exchange Offer offered a basis for settling the litigation that was "fair, reasonable and adequate and in the best interests of Revlon's stockholders as well as Revlon." MOU at 5. The Class A stockholders took a different view.

---

**5.** The only reference to "additional discovery" appears in paragraph 4 of the MOU, which states: "Defendants will provide (and request the cooperation of Barclays to prove) to counsel for Plaintiffs in the Delaware Actions such reasonable discovery, including document discovery and depositions, as is necessary for Plaintiffs in the Delaware Actions and their counsel to confirm the fairness and reasonableness of the Settlement."

Revlon commenced the Exchange Offer on August 10, 2009. The Exchange Offer was subject to "a non-waivable condition that at least a majority of the Class A Common Stock not beneficially owned by MacAndrews & Forbes ... and its affiliates are tendered and not withdrawn in the Exchange Offer." The Schedule TO referred to this as the "Minimum Condition." On September 11, the original deadline for the Exchange Offer, only 8,436,516 shares were tendered, representing approximately 41.7% of the Class A Common not held by MacAndrews & Forbes. Revlon extended the offer until September 17. On that date, only 8,583,238 shares of Class A Common were tendered, still representing only 41.7% of the unaffiliated shares. Revlon extended the offer again to September 24. Old Counsel's handiwork was thus twice rejected by a majority of the class for whose benefit Old Counsel ostensibly negotiated. None of the original named plaintiffs thought enough of the Exchange Offer to tender their Class A shares.

Yet so confident was Old Counsel in the fairness of the Exchange Offer that they decided to facilitate the circumvention of the Minimum Condition. According to the Schedule TO, during the week of September 14, 2009, Old Counsel began to discuss with defense counsel revising the non-waivable Minimum Condition so that it would be met if 7,500,000 shares were tendered. With 8,583,238 shares already tendered, Old Counsel was discussing the *de facto* waiver of a non-waivable condition designed to protect the very stockholders whom Old Counsel purported to represent. According to an amended MOU by which Old Counsel later blessed the waiver, the discussions began "on or around September 10," not during the week of September 14. This is another minor inconsistency where the MOU appears shaded to en-

hance the involvement and efforts of Old Counsel.

And what was the basis for Old Counsel's decision? On the present record, the only insight comes from the amended MOU, which states that "counsel for defendants represented to Delaware Lead Counsel that certain funds ... holding at least approximately 3 million shares of Revlon Class A Common Stock were unable to hold preferred stock generally, and therefore cannot hold the Series A Preferred Stock and have not accepted the Exchange Offer." Assuming 3 million shares were deducted from the public float of 20,042,428, this would leave 17,021,214 unaffiliated Class A shares. The 8,436,516 shares tendered still would not constitute a majority of the outstanding minority shares who were able to tender. This fact is not discussed in the amended MOU.

Instead, the amended MOU recites the following:

> [I]n negotiating this Amendment No. 1, Delaware Lead Counsel have consulted with, and been assisted by, their financial consultant[.]

> [D]uring the pendency of negotiations concerning this Amendment No. 1, Delaware Lead Counsel have also conducted substantial factual and legal research, including obtaining answers from senior management of Revlon, Inc. to a series of questions about, among other things, the Exchange Offer, the Funds, and the non-satisfaction of the Minimum Condition[.]

I am keenly interested in the factual basis for these stipulated averments. The absence of any activity on the docket makes clear that Old Counsel did not use traditional discovery tools to explore, establish, or confirm any facts.

On September 21, 2009, the Board preliminarily approved the concept of a *de facto* waiver of the non-waivable Minimum

Condition. On September 22, MacAndrews & Forbes proposed to modify the Series A Preferred by increasing the liquidation preference from $3.71 per share to $5.21 per share. Ostensibly because of this increase, the Series A Preferred no longer would be entitled to the contingent payment of $1.50 per share if there was no change of control within two years. Increasing this payment from $1.00 to $1.50 was one of the three changes on which Old Counsel settled. MacAndrews & Forbes also eliminated the Series B Preferred concept—a second change on which Old Counsel settled—and provided simply that the Series A Preferred would receive up to $12.50 per share in a qualifying change of control transaction in the third year after issuance. On September 23, as part of the proposed package of changes, Revlon and MacAndrews & Forbes agreed that the interest rate that MacAndrews & Forbes would receive on the Senior Subordinated Term Loan would increase from 11% to 12% per annum and the maturity date would be pushed out by four years.

On September 23, 2009, the Revlon Board signed off on the new terms. On the same day, Old Counsel executed Amendment No. 1 to the Memorandum of Understanding (the "Amended MOU"), blessing all defendants with a broad, transaction-wide release and keeping in place the settlement that would entitle Old Counsel to apply for a fee. After a further extension, Revlon closed the Exchange Offer on October 8, 2009, with a total of 9,336,905 shares of Class A Common tendered—still fewer than necessary to satisfy the pre-amendment minimum condition.

### G. The New Actions Are Filed.

On October 29, 2009, Revlon announced third quarter financial results that exceeded market expectations. I am told the results were consistent with the financial projections disclosed in the Exchange Offer. Revlon's stock price increased as a result.

On December 21, 2009, the law firm of Smith Katzenstein & Furlow LLP filed two new representative actions challenging the Exchange Offer. Smith Katzenstein is a Delaware firm that has litigated representative actions successfully. The firm is not, however, one of the usual Delaware conduits for the traditional plaintiffs' bar.

The first of the December 21, 2009, cases was styled *Gutman v. Perelman,* C.A. No. 5158, 2008 WL 7315644 (Del.Ch.). Smith Katzenstein's co-counsel was the Law Firm of Curtis V. Trinko, LLP of New York, New York, a frequent filer of representative litigation in this Court. The 20–page complaint asserted that the Exchange Offer was substantively unfair and that the disclosure documents were false and misleading. Unlike the original four actions, which challenged a negotiable proposal, the *Gutman* complaint challenged an actual transaction. Otherwise it was not significantly different from the initial four efforts.

The second of the December 21, 2009, cases was styled *Corneck v. Perelman,* C.A. No. 5160, 2009 WL 5048944 (Del.Ch.). Smith Katzenstein's co-counsel was Harwood Feffer LLP of New York, New York. Harwood Feffer's predecessor firms have appeared in numerous Delaware cases, including another matter involving MacAndrews & Forbes' affiliates. *See In re M & F Worldwide Corp. S'holder Litig.,* 799 A.2d 1164 (Del.Ch.2002). The 9–page *Corneck* complaint was the shortest of the six and resembled a hastily drafted first-day filing.

With the two cases on file, the new plaintiffs moved to consolidate their actions, to have the Trinko firm and Harwood Feffer appointed co-lead counsel, and to have Smith Katzenstein appointed as

Delaware liaison counsel. I will refer to these firms together as "New Counsel." In their motion, New Counsel referred to the four prior filed actions and asserted that those cases were "consolidated on behalf of a class of Revlon Shareholders who did not tender their common stock to Revlon." New Counsel argued that "there is a substantial conflict between the current positions of the tendering and non-tendering stockholders." New Counsel asserted that their consolidated action therefore should be permitted to proceed in parallel with the prior actions.

### H. Old Counsel Defends Its Turf, While The Defendants Defend The Settlement.

With challengers on the scene, Old Counsel roused themselves. On January 6, 2010, Old Counsel filed a 32-page amended complaint (the "Amended Complaint" or "AC"). Because none of the named plaintiffs had found the terms of the Exchange Offer sufficiently attractive to merit tendering their shares, Old Counsel rustled up a new plaintiff, Earl Gallegos, who allegedly tendered. The Amended Complaint purported to bring claims for breach of fiduciary duty on behalf of a class of tendering stockholders based on Revlon's failure to disclose material information about its improved financial condition prior to its third quarter results. The bulk of the Amended Complaint described the events leading to the MOU and the Amended MOU.

The Amended Complaint contained a number of questionable allegations, all of which Old Counsel certified for purposes of Court of Chancery Rule 11. The Amended Complaint led off, for example, with the following claim: "After vigorous litigation on behalf of plaintiffs and negotiations with the respective legal counsel of Revlon, the Special Committee ..., and

MacAndrews & Forbes, a settlement in principle of this action was entered into, subject to certain conditions, pursuant to which Revlon would commence an exchange offer...." AC ¶ 2. As I have noted already, the conduct of this litigation was anything but vigorous. It was non-existent. And at least on this preliminary record, the shift to the Exchange Offer had nothing to do with Old Counsel and everything to do with Barclays' refusal to render a fairness opinion.

Other aspects of the Amended Complaint similarly give me pause. The Amended Complaint repeated *verbatim* recitals from the MOU that I have already questioned. *See* AC ¶¶ 51–54, 67–72. In a particularly ironic foible, the Amended Complaint stated: "As alleged herein, in recommending the Exchange Offer, the Company and its directors failed to disclose the fact that Revlon would have a substantial profit for the third quarter." AC ¶ 6. As noted above, the Board purported to fulfill its fiduciary responsibilities to its stockholders by declining to make any recommendation about the Exchange Offer. It was *Old Counsel* who endorsed the Exchange Offer as "fair, reasonable and adequate and in the best interests of Revlon's stockholders as well as Revlon." MOU at 5.

After filing the Amended Complaint, Old Counsel moved to consolidate the two new actions with the prior consolidated action and to confirm the existing leadership structure. In their eagerness to protect their turf, Old Counsel resorted to hyperbole, claiming that they "vigorously prosecuted the claims asserted in the Action," caused Revlon to shift to the Exchange Offer "[i]n lieu of the initial proposal," and had been "operating efficiently and to great effect for months." According to them, "The consistent quality of the pleadings, motions, and efforts of Plaintiffs'

Counsel in the Action, and the vigor with which Plaintiffs' Counsel has litigated the Action warrants the Court's approval of the organizational structure that originally was approved in the Order of Consolidation entered on June 24, 2009." I could quote more from the motion, but these excerpts give its flavor.

Meanwhile defense counsel sprung into action to defend the MOU. I find this unsurprising, because the contemplated settlement will grant all of the defendants a global release for what appears to be a highly problematic transaction otherwise subject to entire fairness review. Like Old Counsel, defense counsel made representations in their papers that do not appear borne out by the record. Thus the defendants represented that "[a]s part of the settlement, it was agreed that instead of the merger transaction contemplated in the [Original Merger] Proposal, Revlon stockholders would have the opportunity (but would not be required) to participate in an exchange offer. . . ." The defendants reinforced this claim in the following paragraph by representing that the MOU provided other benefits "[i]n addition to providing that the proposed transaction would proceed as a voluntary offer, rather than as a mandatory merger as originally proposed." As I have now observed on several occasions, the suggestion that Old Counsel played a causal role in the change in transactional structure does not appear well-founded, no matter how many times it is repeated.

Faced with the competing motions, I instructed the parties to consolidate the cases and to present the defendants' motion to enforce the settlement and the dispute over the leadership structure. Rather than complying, Old Counsel and defense counsel submitted a proposed stipulation and order contemplating that the defendants would withdraw their motion to enforce the settlement and Old Counsel would proceed with confirmatory discovery. I denied the order, reiterated my instruction that the parties submit a form of order consolidating the proceeding, and directed that "[t]he parties will not proceed with confirmatory discovery or the presentation of the settlement until the leadership structure has been addressed." The parties subsequently submitted a stipulated order consolidating the actions and setting a briefing schedule for the dispute over the leadership structure, which I approved.

On March 5, 2010, I heard argument from the competing plaintiffs' groups. On March 10, Old Counsel moved to supplement the record with a second affidavit from Mr. Kornreich. Although Old Counsel should have submitted any information in support of their position prior to the March 5 hearing, I granted the motion. According to the affidavit, Mr. Kornreich determined after reviewing the transcript of the March 5 hearing that "[he] did not explain with sufficient clarity . . . the chronology of events" surrounding the settlement. His supplemental affidavit stated that no settlement proposal was made during the meeting with defense counsel on July 22, 2009. The supplemental affidavit further stated that Old Counsel made their first settlement proposal on July 31, *after* seeing the Barclay's banker book and a draft of the Schedule TO, knowing that Barclay's declined to opine that the Series A Preferred was fair, and knowing that the Special Committee declined to recommend the Original Merger. The MOU did not describe the settlement chronology in this fashion.

## II. LEGAL ANALYSIS

This Court has the power and obligation to revisit and alter the leadership structure for a representative action if

existing counsel fail to provide adequate representation. "A trial court has a continuing duty in a class action case to scrutinize the class attorney to see that he or she is adequately protecting the interests of the class, and if at any time the trial court realizes that class counsel should be disqualified, the court is required to take appropriate action." 4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 13:22, at 417 (2002).

> A decision as to class certification is not immutable. Rule 23(c)(1) empowers and requires a court to carefully scrutinize the adequacy of representation in all class actions. Even where a qualified attorney initially proceeds vigorously with the prosecution of an action, the court must throughout the proceedings, stringently apply the requirement of adequate representation....

*Guerine v. J & W Investment, Inc.*, 544 F.2d 863, 864 (5th Cir.1977); *accord In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1124 (7th Cir.1979); *Meek v. Gem Boat Serv., Inc.*, 86 Ohio App.3d 322, 620 N.E.2d 983, 985 (1993). "Just what measure of representation is adequate is a question of fact that depends on each peculiar set of circumstances." *Guerine*, 544 F.2d at 864. If adequate representation is not being provided, the Court "is required to take appropriate action [and] must either enter orders eliminating the problem or decertify the class." *In re N. Am. Acceptance Corp. Sec. Cases*, 593 F.2d 642, 645 (5th Cir.1979).

■ The sparse Court of Chancery case law on lead counsel selection strongly supports a requirement that lead counsel provide adequate litigation in fact, not merely in appearance. On those occasions when this Court has been forced to choose among competing candidates for lead counsel, our decisions have stressed the impor-

tance of factors that will lead to meaningful representation, including:

- The "quality of the pleading that appears best able to represent the interests of the shareholder class and derivative plaintiffs." *Hirt v. U.S. Timberlands Serv. Co.*, 2002 WL 1558342, at *2 (Del.Ch. July 3, 2002); *accord Wiehl v. Eon Labs*, 2005 WL 696764, at *1 (Del.Ch. Mar. 22, 2005); *TCW Technology*, 2000 WL 1654504, at *4.

- "[T]he willingness and ability of all contestants to litigate vigorously on behalf of an entire class of shareholders." *Hirt*, 2002 WL 1558342, at *2; *accord Wiehl*, 2005 WL 696764, at *1; *TCW Technology*, 2000 WL 1654504, at *4.

- "[T]he enthusiasm or vigor with which the various contestants have prosecuted the lawsuit." *Hirt*, 2002 WL 1558342, at *2; *accord Wiehl*, 2005 WL 696764, at *2; *TCW Technology*, 2000 WL 1654504, at *4.

Likewise, the weight given to the size of a plaintiffs' holding is not used to generate a formalistic ranking, but rather comes into play when a plaintiff owns a sufficient stake to provide an economic incentive to monitor counsel and play a meaningful role in conducting the case. *See Wiehl*, 2005 WL 696764, at *3 ("If every difference in economic stakes were given great weight, the court could simply add up the number of shares and select the law firm with the largest absolute representation. This is not Delaware law.").

In this action, there has not been a prior class certification determination. Instead consistent with this Court's traditional practice, an unopposed consolidation order was entered that implemented a leadership structure the plaintiffs' firms negotiated among themselves. Our tradition of respecting the ability of plaintiffs' counsel to

self-organize depends on the Court's confidence in the law firms and practitioners who appear frequently before us. It depends in particular on our confidence in the Delaware lawyers who build (and sometimes burn) reputational capital with the Court.

## A. Old Counsel Has Not Provided Adequate Representation.

█ I find that Old Counsel has not provided adequate representation in this case. After the initial skirmish over consolidation and lead counsel status, Old Counsel fell blithely into *Cox Communications* mode. They literally did nothing. To put the best spin on it, Old Counsel seemingly recognized that they filed their complaints prematurely and that the consolidated case was subject to a motion to dismiss. I infer that the defendants did not challenge the premature litigation because they wanted the case to stay alive to support a settlement. Everyone knew their parts.

But at some point, Old Counsel should have woken up and conducted a meaningful assessment of their claims. This was a case in which the financial advisor to the Special Committee refused to render a fairness opinion on the same Series A Preferred that, with one change, would be offered in the Exchange Offer. This was a case where the Special Committee declined to recommend the Original Merger. This was a case where the Schedule TO indicated that counsel to MacAndrews & Forbes *and counsel to the Special Committee* then cooked up the Exchange Offer as an alternative. The Special Committee promptly declared its work done and disbanded. The full Board courageously declined to make a recommendation to its stockholders on the Exchange Offer, and the Outside Directors believed that a fairness opinion could not be obtained.

This was not the type of voluntary, non-coercive tender offer that has provided a mechanism for avoiding entire fairness review since *In re Siliconix Inc. Shareholders Litigation,* 2001 WL 716787 (Del.Ch. June 19, 2001). MacAndrews & Forbes was not offering its own shares or cash in a transaction that did not require any corporate action by the Revlon Board. It was Revlon that made the Exchange Offer and offered the Series A Preferred to facilitate a controlling stockholder transaction. *Siliconix* rests in part on the non-involvement of the target board from a Delaware corporate law perspective, *id.* at *7–9, a distinction that does not apply in this context. A series of cases have noted that corporate action by the target board takes a transaction out of the *Siliconix* framework. *See Andra v. Blount,* 772 A.2d 183, 195 n. 30 (Del.Ch.2000); *In re Unocal Exploration Corp. S'holders Litig.,* 793 A.2d 329, 338 n. 26 (Del.Ch.2000), *aff'd sub nom. Glassman v. Unocal Exploration Corp.,* 777 A.2d 242 (Del.2001); *Hartley v. Peapod, Inc.,* C.A. No. 19025, 2002 WL 31957458 (Del. Ch. Feb. 27, 2002) (TRANSCRIPT); *see generally* 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations & Business Organizations* § 9.36A (3d ed. & 2010 Supp.).

Moreover, if there were ever a test case for applying entire fairness review to a tender offer, this one would fit the bill. Under a doctrinal framework outlined by Vice Chancellor Strine, a Delaware court should treat a controller's exchange offer as non-coercive and not subject to entire fairness review if, among other things, it receives an affirmative recommendation from a independent committee of the target board *and* is subject to a non-waivable condition that a majority of the outstanding unaffiliated shares tender *and* there is a commitment by the controller to effect a prompt back-end merger. *See Cox*

*Comm'ns*, 879 A.2d at 624, 646; *In re Pure Resources Inc. S'holders Litig.*, 808 A.2d 421, 444–46 (Del.Ch.2002). The Exchange Offer did not receive a recommendation from an independent committee of the Revlon Board. The Board declined to recommend the Exchange Offer to Revlon's stockholders, and the Schedule TO disclosed that the Outside Directors' believed they could not obtain a fairness opinion for the deal. The majority-of-the-minority condition would later disappear as well.

It does not appear that Old Counsel conducted a meaningful assessment of the claims before offering to settle. During the hearing on the leadership structure, Old Counsel could not recall conducting any legal research, although he later suggested that he believed he re-read *Cox Communications*. He conceded that he only had publicly available information going into the July 22 meeting. The MOU indicates that settlement discussions began during that meeting. In his supplemental affidavit, Mr. Kornreich avers that the first settlement proposal was made on July 31, after Old Counsel learned about Barclay's refusal to issue a fairness opinion and the Special Committee's inability to recommend the Original Merger. I have trouble deciding which scenario is worse: Old Counsel making their settlement proposal based on no information, or Old Counsel doing so after learning about the serious problems with the contemplated transaction.

Fate then bestowed upon Old Counsel an opportunity to recover. When the defendants proposed the *de facto* waiver of the Minimum Condition, the Exchange Offer had twice failed to obtain tenders from a majority of the class of stockholders whom Old Counsel purported to represent. This was true even if Old Counsel accepted the defendants' representation that funds holding approximately three million shares

(and were the defendants rounding up?) could not tender because they could not hold preferred stock. Rather than treating this as powerful evidence of the unfairness of the transaction and using it as grounds to terminate the MOU and commence real litigation, Old Counsel signed off on the Amended MOU and the *de facto* waiver of the non-waivable Minimum Condition. When handed a chance to stand up for the class, Old Counsel lay down.

The docket establishes that Old Counsel has acted only when there was a dispute over control of the case and Old Counsel's path to a fee. Hence there was a flurry of activity at the outset of the case. Hence Old Counsel reacted vigorously when New Counsel emerged. This behavior and the overall conduct of the litigation fits with self-interested motivations, not adequate representation.

Taking this conduct as a whole, I conclude that Old Counsel has not provided adequate representation. This conclusion provides a sufficient grounding to replace Old Counsel. *Cf. In re TD Banknorth S'holders Litig.*, 938 A.2d 654, 668 (Del.Ch. 2007) (rejecting settlement where lead counsel unreasonably failed to investigate or pursue viable claims before consenting to settlement); *In re SS & C Tech. Inc. S'holders Litig.*, 911 A.2d 816, 818 (Del.Ch. 2006) (declining to approve settlement where plaintiffs' counsel entered into a disclosure-only settlement after a document demand was served but before any discovery was taken; finding that plaintiffs' counsel failed to establish that "the potential claims belonging to the class were adequately or diligently investigated or pursued").

In addition, I am replacing Old Counsel because they have impaired their credibility with the Court. When New Counsel emerged and challenged Old Counsel's turf, Old Counsel responded with hyper-

bolic and self-aggrandizing descriptions of their performance and achievements. I have been told repeatedly, in various permutations, that Old Counsel "vigorously prosecuted the claims asserted in the Action" and engaged in "arduous arm's-length negotiations." These assertions were supported by little more than punctuation. It is true that they were repeated in Mr. Kornreich's original affidavit. But Old Counsel has not provided me with a single letter, email, or other contemporaneous document that might suggest vigor, ardor, or any other form of vibrant activity.

Lest I be accused of fixating on adverbs, I note that the firms who comprise the Old Counsel group have demonstrated their acute sensitivity to the criticality of accurate modifiers. Thus the Rosenthal firm and a predecessor of the Abbey Spanier firm successfully defeated a motion for summary judgment where a proxy statement disclosed that a board of directors and special committee "carefully considered" a merger; according to the plaintiffs' firms, the directors had not acted "carefully." *In re Tele–Communications, Inc. S'holders Litig.*, 2005 WL 3642727, at *6 (Del.Ch. Dec.21, 2005). In another case, the Rosenthal firm argued successfully on appeal that they had stated a claim for breach of fiduciary duty where a proxy statement disclosed that "[a]fter careful deliberations," a board rejected a merger proposal; according to the complaint, there had been little or no deliberation. *Gantler v. Stephens*, 965 A.2d 695, 710–11 (Del.2009). It does no disservice to Old Counsel to expect them, as fiduciaries for a class, to adhere to the same standards that they expect from fiduciaries for a corporation. Old Counsel has not hesitated to assert that disclosures of a similar tenor by corporate fiduciaries were false and misleading. While I decline as-yet to use the adjectives "false" and "mislead-

ing," I regard Old Counsel's representations as sufficiently inconsistent with the objective record as to impair Old Counsel's credibility.

Equally important, I have serious concerns about the accuracy of the MOU, including its factual recitations and assertions about the basis for the settlement. As I have discussed in the Factual Background, the MOU's recitations appear exaggerated (at best). The errors are not distributed evenly, with some counting in favor Old Counsel and the settlement and others counting against. All of the MOU's questionable elements expand the role of Old Counsel, the importance of the litigation, and the lawsuit's role in the decision to restructure the merger as an exchange offer. I am forced to wonder if this connection was envisioned after the fact as a basis for the settlement. *Cf. Off v. Ross*, 2008 WL 5053448, at *9 (Del.Ch. Nov.26, 2008) ("[A]n event that is a *fait accompli, i.e.,* one that would have occurred notwithstanding the settlement, cannot serve as valid consideration for the release of class claims."); *TD Banknorth*, 938 A.2d at 669 (same); *In re Cellular Commc'ns Int'l*, 752 A.2d 1185, 1186–87 (Del.Ch.2000) (same).

Factual recitations in an MOU must be accurate. In the ordinary course of a settlement, the recitations from the MOU appear in the settlement stipulation and form part of the record that the Court considers when evaluating the settlement. The recitations also form the basis for the factual disclosures about the litigation that are provided to stockholders in the notice of settlement. All parties—not just the plaintiffs—sign off on the recitations, and their accuracy is critical to the integrity of the settlement process. In advocating positions to me, Old Counsel and defense counsel have treated the recitals in the MOU as fact.

Given Old Counsel's hyperbolic representations and my concerns about the MOU, I cannot in good conscience permit Old Counsel to take charge of the confirmatory discovery process and the presentation of the settlement. Were I generally cynical about the motives and capabilities of the plaintiffs' bar, I might well dismiss what happened here as simply another example of business as usual. But I share our law's premise that representative litigation serves as a valuable check on managerial conflicts of interest. *See In re Fuqua Indus. S'holder Litig.*, 752 A.2d 126, 133 (Del.Ch.1999). Stockholder plaintiffs can and do achieve meaningful results. But it requires effort, something absent from the litigation to date.

There are sound policy reasons for this Court to police against shirking by representative counsel. Traditional plaintiffs' law firms who bring class and derivative lawsuits on behalf of stockholders without meaningful economic stakes can best be viewed as entrepreneurial litigators who manage a portfolio of cases to maximize their returns through attorneys' fees.[6] That entrepreneurial litigators are the driving force behind representative litigation does not itself carry positive or negative normative content. Entrepreneurial litigators create case-specific benefits by obtaining monetary recoveries and inducing beneficial corporate changes. Perhaps more importantly, entrepreneurial litiga-

tors produce a public good by deterring corporate wrongdoing. Balanced against these positive effects are problems of opportunism, over-deterrence, over-enforcement, and agency costs. Whether the traditional plaintiffs' bar generates net social benefits depends on the former exceeding the latter.

Handling a portfolio of cases is not inherently problematic. Diversification can be a prudent strategy, and a plaintiffs' lawyer cannot expect to win every case. But a systemic problem emerges when entrepreneurial litigators pursue a strategy of filing a large number of actions, investing relatively little time or energy in any single case, and settling the cases early to minimize case-specific investment and maximize net profit. *See Understanding the Plaintiffs' Attorney* at 687–90, 711–12. Once a pattern for settlement is established, entrepreneurial litigators have less reason to evaluate and screen individual cases, because their maximal returns are generated through volume. *See id.* at 718. Scholars have observed that the litigation practices of the traditional plaintiffs' bar in this Court suggest the use of this business model. *See* Elliott J. Weiss & Lawrence J. White, *File Early, Then Free Ride: How Delaware Law (Mis)Shapes Shareholder Class Actions*, 57 Vand. L.Rev. 1797 (2004). The resulting system involves little real litigation activity, generates questionable benefits for class mem-

---

6. *See generally* John C. Coffee, Jr., *Understanding the Plaintiffs' Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions*, 86 Colum. L.Rev. 669 (1986) (hereinafter, *"Understanding the Plaintiffs' Attorney"*). Professor Coffee has written extensively on representative actions, and his 1986 article is foundational and oft-cited. For examples from the mountain of academic literature addressing entrepreneurial plaintiffs' counsel, *see* Myriam Gilles & Gary B. Friedman, *Exploding The Class Action Agency Costs Myth: The Social Utility of Entrepreneurial Lawyers*, 155 U. Pa. L.Rev. 101 (2006); A.C. Pritchard, *Markets as Monitors: A Proposal to Replace Class Actions with Exchanges as Securities Fraud Enforcers*, 85 Va. L.Rev. 925 (1999); James D. Cox, *The Social Meaning of Shareholder Suits*, 65 Brook. L.Rev. 3 (1999); Jonathan R. Macey & Geoffrey P. Miller, *The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform*, 58 U. Chi. L.Rev. 1 (1991).

bers, provides transaction-wide releases for defendants, and offers a good living for the traditional plaintiffs' bar. In a legal system that values representative litigation as a positive force, the business model of filing and free-riding has nothing to commend it.[7]

The ability of defendants to challenge the legal sufficiency of representative actions on the pleadings, whether for compliance with Rule 23.1 or by invoking the protections of the business judgment rule, helps limit the degree to which entrepreneurial plaintiffs can litigate on a volume basis. *Cox Comm'ns*, 879 A.2d at 644. The limiting function of the defendants' ability to seek dismissal, however, operates imperfectly when defendants can routinely purchase global releases by paying transactionally immaterial plaintiffs' fees, and when defendants rationally prefer to do so. *Brinckerhoff v. Texas Eastern Products Pipeline Co.*, 986 A.2d 370, 384–86 (Del.Ch. 2010). Addressing this problem requires other meaningful checks on the representative litigation process. One is the historic willingness of this Court to reject inadequate settlements, including cases where the plaintiffs have filed prematurely and have not contributed meaningfully, or where the settlement appears to be little more than a vehicle for purchasing a trans-action-wide release through the payment of an attorneys' fee. Another is the ability and willingness of this Court to replace representative counsel who engage in conscious shirking, who appear to be doing little more than prematurely harvesting a case as part of their overall inventory, or who otherwise are not providing adequate representation.

All else equal, the threat of replacement should cause representative counsel to invest more significantly in individual cases, which in turn should lead representative counsel to analyze cases to identify actions whose potential merit justifies the investment. The threat of mid-case replacement thus should inhibit shirking. Other consequences, both foreseeable and unforeseeable, are certainly possible. Perhaps greater judicial oversight of frequent filers will accelerate their efforts to populate their portfolios by filing in other jurisdictions. *See Anywhere But Chancery: Ted Mirvis Sounds an Alarm and Suggests Some Solutions*, M&A J., May 2007, at 17. If they do, and if boards of directors and stockholders believe that a particular forum would provide an efficient and value-promoting locus for dispute resolution, then corporations are free to respond with charter provisions selecting an exclusive forum for intra-entity disputes.[8] Regard-

---

**7.** By contrast, a policymaker who believed that representative actions impose a net social cost might regard rote quasi-litigation as the next best alternative to eliminating representative litigation entirely. Delaware does not endorse the negative assessment of representative litigation that would undergird such a view. *See, e.g., Cox Comm'ns*, 879 A.2d at 643 (noting importance of representative litigation in protecting stockholders against fiduciary wrongdoing); *Fuqua*, 752 A.2d at 133 (noting that as a result of private enforcement, "corporations are safeguarded from fiduciary breaches and shareholders thereby benefit"); *Bird v. Lida*, 681 A.2d 399, 403 (Del.Ch.1996) (Allen, C.) (providing economic analysis of benefits to corporation and stockholders that are generated by the monitoring and deterrence provided by representative litigation).

**8.** 8 *Del C.* § 102(b)(1) (authorizing certificate to contain "[a]ny provision for the management of the business and for the conduct of the affairs of the corporation, and any provision creating, defining, limiting and regulating the powers of the corporation, the directors, and the stockholders, or any class of the stockholders ..., if such provisions are not contrary to the laws of this State."); *see Elf Atochem N. Am. Inc. v. Jaffari*, 727 A.2d 286, 287 (Del.1999) (approving provision in LLC agreement requiring that all intra-entity disputes be resolved exclusively by arbitration or court proceedings in California); *Douzinas*

less, while in the short run policing frequent filers may cost some members of the bar financially, in the long run it enhances the legitimacy of our State and its law not to facilitate a system of transactional insurance through quasi-litigation.

This is a case in which multiple factors cause me to conclude that Old Counsel has not provided adequate representation. I am therefore removing Wolf Popper and Rigrodsky & Long from their positions as Co–Lead Counsel and the Rosenthal firm from its position as Delaware Liaison Counsel. They will remain members of the Plaintiffs' Committee of the Whole.

## B. New Counsel Will Serve As Co–Lead Counsel Going Forward.

■ Having concluded that I am compelled to alter the leadership structure, I must determine who should take over the case. The logical candidate is New Counsel.

This potential solution has difficulties of its own. First, New Counsel did not ask to take over the litigation. They only sought to represent a class of stockholders who exchanged their Class A Common for Series A Preferred. During the March 5 hearing, I asked New Counsel if they were willing to represent the same class as Old Counsel for purposes of conducting confirmatory discovery and determining whether to proceed with the settlement. New Counsel agreed.

But although this solved one difficulty, New Counsel identified another. As New Counsel pointed out, their clients tendered their Class A shares in the Exchange Offer and now hold Series A Preferred. New Counsel does not represent a holder of Class A shares. New Counsel expressed concern that they could not replace Old Counsel because of their clients' holdings.

Although I commend New Counsel for making this disclosure and raising the concern, I do not view the holdings of New Counsel's clients as an impediment to lead counsel status. The next step in this proceeding will be to conduct confirmatory discovery as contemplated by the MOU and Amended MOU. That agreement purports to bind and release all claims held by class consisting of the following:

All Revlon stockholders and their successors in interest and transferees, immediate and remote (other than the Defendants and their affiliates, successors in interest, predecessors, representatives, trustees, executors, administra-

---

*v. Am. Bureau of Shipping, Inc.,* 888 A.2d 1146, 1149 (Del.Ch.2006) (enforcing provision in LLC agreement requiring that all intra-entity disputes be resolved by arbitration); Sara Lewis, Note, *Transforming the "Anywhere but Chancery" Problem into the "Nowhere but Chancery" Solution,* 14 Stanford J.L. Bus. & Fin. 199 (2008) (analyzing validity of Delaware forum selection provision for intra-entity disputes); *see also* Faith Stevelman, *Regulatory Competition, Choice of Forum, and Delaware's Stake in Corporate Law,* 34 Del. J. Corp. L. 57, 133–35 (2009) (discussing potential availability of forum selection provision for intra-corporate disputes). Both Stevelman and Lewis note that one public company, NetSuite, Inc., has a Delaware forum selection provision in its charter. *See* Lewis, *supra,* at 202; Stevelman, *supra,* at 133 n. 294.

Lewis notes that Oracle Corporation has a Delaware forum selection provision for derivative actions in its bylaws. *See* Lewis, *supra,* at 202–03. As *Elf Atochem* and *Douzinas* demonstrate, a provision selecting an exclusive forum for intra-entity disputes need not choose the Delaware courts. For example, business principals who all live in the same distant locale might form a Delaware entity to gain the many benefits conferred by Delaware law, yet prefer to litigate intra-entity disputes in their local jurisdiction. I can envision that the Delaware courts would retain some measure of inherent residual authority so that entities created under the authority of Delaware law could not wholly exempt themselves from Delaware oversight. The issues implicated by an exclusive forum selection provision must await resolution in an appropriate case.

tors, heirs, assigns or transferees, immediate and remote, and any person or entity acting for or on behalf of, or claiming under any of them, and each of them) during the period from the close of business on April 20, 2009, through the consummation of the Exchange Offer.

MOU at 9–10. New Counsel's named plaintiffs were "stockholders ... during the period from the close of business on April 20, 2009, through the consummation of the Exchange Offer." They are thus part of the class and purportedly are bound by the MOU and Amended MOU. Because the claims of New Counsel's named plaintiffs will be foreclosed by the settlement contemplated by the MOU and Amended MOU, New Counsel can appropriately conduct confirmatory discovery, evaluate the fairness of the settlement, and determine whether to present the settlement to the Court.

One of the disputed issues briefed by Old and New Counsel was whether there is a conflict of interest between continuing Class A holders and Series A Preferred holders. For purposes of the settlement proceedings, I do not believe there is a conflict that would preclude New Counsel from serving as lead counsel. The Delaware Supreme Court has held that in litigation challenging a corporate transaction, this Court has discretion to certify a class that includes holders, buyers and sellers. *In re Philadelphia Stock Exchange, Inc.,* 945 A.2d 1123, 1141 (Del.2008). In the *Philadelphia Stock Exchange* case, the consideration in the settlement was fixed. Chancellor Chandler approved the fairness of the settlement as a whole, postponing until later any potential allocation of settlement consideration among competing class members. *Id.* The Supreme Court approved this approach, noting that (i) conflicts might never arise, (ii) any conflicts that did arise could be dealt with later through sub-classes, and (iii) all that remained in the case was to carry out the settlement. *Id.* at 1141–42.

In its present posture, this case resembles *Philadelphia Stock Exchange.* The settlement involves changes to the Exchange Offer and other non-monetary consideration that already have been provided to the class. Thus if I approve the settlement, no conflicts will arise, and all that remains will be settlement implementation. If, by contrast, I disapprove the settlement, then I can determine at that point on a fuller record whether sub-classes are needed.

I therefore find that New Counsel can take over as lead counsel in the case. I will not, however, adopt the leadership structure that New Counsel proposed, in which the Harwood Feffer firm and the Trinko firm would serve as co-lead counsel with Smith Katzenstein as Delaware liaison counsel. The qualifications and *modus operandi* of the Harwood Feffer and Trinko firms closely resemble those of Old Counsel. As relatively small firms managing a portfolio of representative litigation, the Harwood Feffer and Trinko firms have similar economic incentives to settle early to maximize the net benefit to themselves, rather than expending resources to press litigation further for the benefit of the class. I have no desire to replace Pilgrims with Puritans.

The Smith Katzenstein firm, by contrast, is a Delaware law firm that is well-known to the Court. The firm frequently represents paying clients and does not appear to litigate plaintiffs' cases using a portfolio strategy. The members of that firm, including the lead lawyer in this case,

have built up reputational capital with the Court and have proven willing to engage in the hard work of actual litigation.

In an effort to ensure that the class is adequately represented going forward, I designate Smith Katzenstein, the Harwood Feffer firm, and the Trinko firm as co-lead counsel. In the event the co-lead firms disagree about any aspect of the litigation, including the allocation of any potential fee award, the Smith Katzenstein firm will have decision-making authority.

New Counsel's immediate task will be to conduct confirmatory discovery, evaluate the settlement, and (if appropriate) present the settlement to the Court. Because Old Counsel did not take any discovery, New Counsel will need to conduct relatively expansive discovery into the merits of the underlying claims.

As part of the confirmatory discovery process, New Counsel will explore the conduct of the negotiations that led to the MOU and Amended MOU. *See General Motors*, 594 F.2d at 1124 ("We think that the conduct of the negotiations was relevant to the fairness of the settlement and that the trial court's refusal to permit discovery or examination of the negotiations constituted an abuse of discretion."); *see also Ginsburg v. Philadelphia Stock Exchange, Inc.*, 2007 WL 2982238, at *2 (Del. Ch. Oct. 9, 2007) (noting that objectors generally may take discovery into "how negotiations were initiated, how they proceeded, when various aspects of the settlement were reached" and "the competence of the settlement (the timing of the settlement in the context of the litigation, the soundness of the judgment to settle the case)"). At a minimum, New Counsel should explore the following issues using traditional written discovery methods and through depositions:

- The degree of factual and legal investigation conducted by Old Counsel prior to filing the litigation, commencing settlement discussions, agreeing to the MOU, and agreeing to the Amended MOU;

- The number of hours expended by Old Counsel during the various phases of the case;

- The course of the negotiations giving rise to the MOU and Amended MOU;

- The accuracy of the factual recitals and causal stipulations in the MOU and the Amended MOU;

- The identity and qualifications of Old Counsel's financial advisor, the terms of the business arrangement with the financial advisor, the amount and nature of the work performed by the financial advisor in this matter and the timing of compensation to the financial advisor, and the substance of the financial advisor's views, and

- The basis for Old Counsel's determination that the settlement was fair and adequate.

New Counsel of course remains free to explore whatever additional topics New Counsel believes are pertinent to the evaluation of the settlement.

The members of the Plaintiffs' Committee of the Whole will cooperate with New Counsel during the confirmatory discovery process. I expect the firms to respond to written discovery and notices of deposition. Any discovery disputes should be brought to my attention promptly.

I regard New Counsel's pursuit of confirmatory discovery under these circumstances as conferring a benefit on Revlon and the putative class. New Counsel should keep careful track of their time and expenses so that I may evaluate the reasonableness of any fee application they

wish to make. There also may be cause to shift fees, particularly if it turns out that statements in the MOU were false. *See In re SS & C Tech., Inc. S'holders Litig.*, 948 A.2d 1140, 1151–52 (Del.Ch.2008) (requiring counsel to bear fees based on, among other things, misrepresentations and incorrect statements in court filings).

## III. CONCLUSION

For the foregoing reasons, Wolf Popper and Rigrodsky & Long are no longer Co–Lead Counsel. The Rosenthal firm is no longer Delaware Liaison Counsel. The Smith Katzenstein firm, Harwood Feffer, and the Trinko firm are added to the Plaintiffs' Committee of the Whole and appointed Co–Lead Counsel. I am entering an order contemporaneously that reflects the new leadership structure.