# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SOLARRESERVE CSP HOLDINGS, LLC, a Delaware limited liability company, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | **C.A. No. 2019-0791-JRS** |
| TONOPAH SOLAR ENERGY, LLC, a Delaware limited liability company, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: February 24, 2020
Date Decided: March 18, 2020

Francis G.X. Pileggi, Esquire of Eckert Seamans Cherin & Mellott, LLC, Wilmington, Delaware and Michael G. Platner, Esquire, John S. Poulos, Esquire and Vincent F. Alexander, Esquire of Lewis Brisbois Bisgaard & Smith LLP, Ft. Lauderdale, Florida, Attorneys for Plaintiff.

Andrew D. Cordo, Esquire, Shannon E. German, Esquire and Nora M. Crawford, Esquire of Wilson Sonsini Goodrich & Rosati, P.C., Wilmington, Delaware and Matthew A. Feldman, Esquire, Todd G. Cosenza, Esquire and Charles D. Cording, Esquire of Willkie Farr & Gallagher LLP, New York, New York, Attorneys for Defendant.

**SLIGHTS, Vice Chancellor**

Tonopah Solar Energy, LLC ("Tonopah") was created to build and operate a solar power plant in Nevada. At Tonopah's formation, Plaintiff, SolarReserve CSP Holdings, LLC ("SolarReserve"), was its sole owner. As the project moved forward, and expenses mounted, SolarReserve determined that it needed to seek out other funding sources to help cover expenses. After exploring its options, Tonopah took out loans from the United States Department of Energy ("the DOE") and entered into a co-venture relationship with a construction firm, Cobra Thermosolar Plants, Inc. ("Cobra").

The funding infusion did not solve Tonopah's challenges. According to SolarReserve, Cobra botched the construction of the power plant, which caused the DOE to declare events of default under the governing loan documents. The declarations, in turn, triggered the DOE's rights to alter Tonopah's governance structure, thereby removing SolarReserve from its position of control over Tonopah.

SolarReserve now petitions the Court to dissolve Tonopah, not as a matter of law under Delaware's Limited Liability Company Act (the "Act"),[1] but as a matter of equity. According to SolarReserve, it is no longer reasonably practicable to carry on Tonopah's business.

---

[1] 6 *Del. C.* § 18-101 *et seq.*

1

Statutory dissolution of a Delaware limited liability company ("LLC") is only available to the entity's members and managers. SolarReserve is neither a member nor manager of Tonopah. Acknowledging it has no statutory standing to seek dissolution, SolarReserve urges the Court to invoke its *equitable* powers to order Tonopah's dissolution. In response, Tonopah has filed a Motion to Dismiss SolarReserve's Amended Complaint for failure to state a viable basis for dissolution.[2]

After giving SolarReserve the benefit of all reasonable inferences, I conclude it has not pled facts that would justify, much less allow, dissolution as a matter of equity. SolarReserve may have other rights and remedies stemming from the facts it alleges, but a Court order dissolving Tonopah is not one of them.

## I. FACTUAL BACKGROUND

I draw the facts from the allegations in the Complaint, documents incorporated by reference or integral to that pleading and judicially noticeable facts.[3]

---

[2] Am. Compl. (D.I. 38) ("Complaint").

[3] *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (quoting *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69 (Del. 1995)) (noting that on a motion to dismiss, the court may consider documents that are "incorporated by reference" or "integral" to the complaint); D.R.E. 201–02 (codifying Delaware's judicial notice doctrine).

For purposes of this Motion to Dismiss, I accept as true the Complaint's well-pled factual allegations and draw all reasonable inferences in Plaintiff's favor.[4]

### A. Parties and Relevant Non-Parties

Defendant, Tonopah, is a Delaware LLC.[5] Plaintiff, SolarReserve, holds an "indirect equity interest" in Tonopah "through several intermediary entities."[6] Specifically, SolarReserve holds a 50% interest in Tonopah Solar Investments, LLC ("TSI"), which has an interest in Tonopah Solar Energy Holdings I, LLC, which, in turn, has an interest in Tonopah Solar Energy Holdings II, LLC ("Holdings"). Holdings is the sole member of Tonopah.[7]

Non-party, Cobra, is an engineering, procurement and construction firm.[8] As explained in more detail below, Cobra and SolarReserve agreed to become "50/50 co-venturers" in the construction of the Tonopah solar power plant in

---

[4] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002).

[5] Compl. at 1.

[6] Compl. ¶ 1.

[7] Compl. ¶¶ 1, 14.

[8] Compl. ¶ 10.

Nevada.[9] Non-party, the DOE, is a federal agency that agreed to fund "the majority" of the power plant project.[10]

The following organizational chart depicts the relationships between the relevant parties and non-parties:[11]



9 Compl. ¶¶ 17–18.

10 Compl. ¶ 15.

11 The chart is compiled from Compl. ¶¶ 11–14; Compl. Ex. C.

4

## B. Tonopah's Origins and Finances

In March 2008, a SolarReserve affiliate formed Tonopah for the stated purpose of developing, owning and operating a solar power plant in Nevada.[12] At first, SolarReserve effectively owned 100% of Tonopah's membership interests.[13] To get its power plant up and running, Tonopah planned to proceed in three steps.

*First*, in response to higher costs than anticipated related to construction of the power plant, Tonopah went in search of capital.[14] In the fall of 2011, Tonopah entered into agreements with the DOE by which the DOE guaranteed a $700 million loan to Tonopah (the "DOE Loan").[15] The DOE Loan is governed by a Loan Guarantee Agreement (the "LGA").[16]

*Second*, with capital in hand, Tonopah hired Cobra to design and build the power plant.[17] Cobra agreed to build the power plant not only as a contractor but

---

[12] Compl. ¶ 9.

[13] *Id.*

[14] Compl. ¶ 15.

[15] Compl. ¶ 9.

[16] Compl. ¶ 27.

[17] Compl. ¶ 10.

also as a co-venturer with SolarReserve.[18]  SolarReserve surrendered its sole ownership of Tonopah to allow Cobra to become a 50% investor in TSI, which, in turn, held an indirect interest in Tonopah.[19]

*Third*, as a condition of the DOE's willingness to "fund the majority" of Tonopah's power plant project, the DOE required Tonopah to find a buyer for the power plant's energy before Tonopah could start building.[20]  To fulfill this requirement, Tonopah contracted with Nevada Power Company d/b/a/ NV Energy ("NVE").[21]  NVE agreed to purchase Tonopah's energy, subject to certain conditions.[22]  To memorialize their agreement, Tonopah and NVE signed a Power Purchase Agreement (the "PPA"), which obligated NVE to purchase energy over a span of 25 years.[23]  The PPA required Tonopah's plant to be up and running by "late 2014."[24]

---

[18] Compl. ¶¶ 17–18.

[19] *Id.*

[20] Compl. ¶¶ 15–16.

[21] *Id.*

[22] Compl. ¶ 20.

[23] *Id.*

[24] *Id.*

As a result of these three steps, SolarReserve surrendered its sole ownership of Tonopah, took on a 50% co-venturer in Cobra, and assumed $700 million in debt guaranteed by the DOE with significant strings attached (as discussed below). These results were fine from SolarReserve's perspective so long as the project moved forward as planned. Unfortunately, it didn't.

## C. Tonopah's LLC Agreement

Tonopah's constitutive document is its Third Amended and Restated Limited Liability Company Agreement (the "LLC Agreement").[25] The LLC Agreement makes clear that SolarReserve *was* Tonopah's "Original Member," but that changed over time. As of the time SolarReserve brought its Complaint, Tonopah had one "sole member"—Holdings—*not* SolarReserve.[26] Section 3.5 of the LLC Agreement states, "[n]ew members shall be admitted only upon the approval of the Board of Managers."[27] And Section 8.1 provides that Holdings may not "sell, assign or transfer . . . all or any part of its Membership Interests . . . without the prior written

---

[25] Compl. at 1; Compl. Ex. A (D.I. 38) (the LLC Agreement).

[26] LLC Agreement at 1 (recitals) ("WHEREAS, [SolarReserve] assigned and transferred all of its membership interests in [Tonopah] to [Holdings]."). Holdings is now Tonopah's sole member. Compl. ¶ 14.

[27] LLC Agreement § 3.5.

consent of the Board of Managers."[28]  These provisions, often called "choose your partner" provisions, further remove SolarReserve from Tonopah's governance.

### D. Tonopah's Troubles

SolarReserve alleges everything went south after Cobra encountered "construction delays" and performed "grossly deficient work."[29]  Indeed, the power plant is still not fully operational today.[30]  These delays caused Tonopah to miss key deadlines under the PPA, releasing NVE from its obligations to purchase Tonopah's energy.[31]

When NVE walked away from the project, the DOE declared an event of default under the LGA.[32]  This, in turn, allowed the DOE to exercise certain remedies under the LGA and other related agreements, including (i) a right to replace SolarReserve's nominees to Tonopah's Board of Managers (the "Board") with its own nominees and (ii) placing Holdings' Tonopah units with a collateral agent for

---

[28] LLC Agreement § 8.1

[29] Compl. ¶ 30.

[30] Compl. ¶ 34.

[31] Compl. ¶¶ 35–36.

[32] Compl. ¶ 37; Compl. Ex. B at 1–2 (the DOE's Default Letter, instructing Holdings to "cease and desist from taking any action purporting to exercise the voting, consensus, and other powers of ownership pertaining to the Pledged Collateral" under the LGA and the Equity Pledge Agreement between Holdings and the DOE).

the DOE's benefit until the event of default was cured.[33] Until the default is cured, Holdings is prohibited from exercising the "powers of ownership" pertaining to its Tonopah units.[34] Currently, SolarReserve alleges Tonopah is insolvent and without any realistic possibility of fulfilling its stated purpose (building a solar power plant).[35]

The Complaint contains a torrent of accusations against Cobra and the DOE related to Tonopah's post-loan troubles. The DOE allegedly "manufactured" its events of default while Cobra used its 50% investment in TSI to "veto" Tonopah's efforts to sue Cobra for its negligent construction services.[36] The Complaint also insinuates the DOE and Cobra are working together to "freeze SolarReserve out" of its investment in Tonopah.[37] I do not tarry long on these allegations as *none* of the alleged wrongdoers are parties to this action.

---

[33] Compl. ¶¶ 37, 42–43, 50; Compl. Ex. B at 2 ("Pursuant to . . . the Equity Pledge Agreement, upon the occurrence and during the continuation of an Event of Default . . . under the [LGA] all rights of [Holdings] to exercise the voting, consensus and other powers of ownership pertaining to the Pledged Collateral . . . ceased and such rights vested in the Collateral Agent."); Opening Br. in Supp. of Def.'s Mot. to Dismiss the Am. Compl. (D.I. 17) Ex. 3 (the "Equity Pledge Agreement") §§ 2 (defining "Pledged Collateral" to include "all limited liability company interests . . . of [Tonopah]"), 6(b).

[34] Equity Pledge Agreement §§ 2, 6(b).

[35] Compl. ¶ 45.

[36] Compl. ¶¶ 37, 40.

[37] Compl. ¶ 43.

### E. Procedural History

On October 2, 2019, SolarReserve filed its original Verified Complaint pursuant to Section 18-110 of the Act seeking an order declaring that SolarReserve had the right to appoint a manager to the Board and naming Tonopah and the DOE as defendants.[38] Soon after, the DOE removed the case to the United States District Court for the District of Delaware ("Delaware District Court").[39]

While the case was proceeding in the Delaware District Court, SolarReserve amended its pleading by filing the now-operative Complaint—dropping the DOE as a defendant and seeking Tonopah's equitable dissolution rather than a declaration of rights.[40] This amendment prompted the Delaware District Court to remand the case back to this court for further proceedings on November 18, 2019.[41] On that same day, Tonopah filed a Motion to Dismiss under Court of Chancery Rule 12(b)(6).[42]

## II. ANALYSIS

In considering a motion to dismiss under Court of Chancery Rule 12(b)(6), the Court applies a well-settled standard:

---

[38] D.I. 1.

[39] D.I. 8.

[40] D.I. 38.

[41] D.I. 9.

[42] D.I. 10.

(i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are 'well-pleaded' if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[43]

Given that SolarReserve's arguments in favor of dissolution rely heavily on this Court's equitable powers, I begin my analysis by considering the proper role of equity in the context of Delaware LLCs. Next, I briefly address the statutory standards for dissolution before turning to SolarReserve's efforts to plead a case for equitable dissolution. As I explain below, Tonopah's Motion to Dismiss must be granted because SolarReserve fails to state a reasonably conceivable claim for equitable dissolution.

## A. Equity and the Enforcement of LLC Agreements

At its essence, a Delaware LLC is a "creature of contract, designed to afford the maximum amount of freedom of contract, private ordering and flexibility to the parties involved."[44] Indeed, "[i]t is this flexibility that gives 'uncorporate' entities like limited liability companies their allure."[45] With this in mind, Delaware courts take care to uphold "the public policy of Delaware" to honor the expressed intent of

---

[43] *Savor*, 812 A.2d at 896–97 (citations omitted).

[44] 6 *Del. C.* § 18-1101(b); *R&R Capital, LLC v. Buck & Doe Run Valley Farms, LLC*, 2008 WL 3846318, at *4 (Del. Ch. Aug. 19, 2008) (internal quotations omitted).

[45] *R&R Capital*, 2008 WL 3846318, at *4.

the parties to an LLC agreement as determined from the language of the agreement.[46] Except in the most extreme circumstances, this court will not "invoke equitable principles to override the plain language of an [LLC agreement]."[47]

## B. Judicial Dissolution

Delaware's LLC Act identifies certain circumstances under which a Delaware "a limited liability company [can be] dissolved and its affairs [] wound up."[48] Among them is "[t]he entry of a decree of judicial dissolution under § 18-802."[49] Section 18-802, in turn, allows a Delaware LLC's "member or manager" to seek a judicial decree of dissolution.[50] To the extent a member or manager of a Delaware LLC seeks court-ordered dissolution, Sections 18-801 and 18-802 lay out the path he must traverse to achieve that result.

---

[46] *Id.*, at *6; *Absalom Absalom Trust v. Saint Gervais LLC*, 2019 WL 2655787, at *5–6 (Del. Ch. June 27, 2019).

[47] *Absalom*, 2019 WL 2655787, at *6. *See also id.* (noting that equity "always attempts to ascertain, uphold, and enforce rights and duties which spring from the *real* relations of the parties."); *R&R Capital*, 2008 WL 3846318, at *7 (observing that Chancery will not lightly disregard clear contractual language under the guise of equity "lest the courts erode the primary attraction of limited liability companies.").

[48] 6 *Del. C.* § 18-801(a).

[49] 6 *Del. C.* § 18-801(a)(5). The Act lists other scenarios that trigger dissolution, including that the lifespan of the entity as stated in the LLC agreement has expired, that members by two-thirds vote agree to dissolution, and that the LLC no longer has members. *See 6 Del. C.* § 18-801(a)(1)–(5).

[50] 6 *Del. C.* § 18-802.

As noted, SolarReserve does not seek Tonopah's statutory dissolution because it is neither member nor manager of Tonopah.[51] Instead, SolarReserve asks the Court to dissolve Tonopah as a matter of equity.[52] This is a far less-traveled path to achieve the dissolution of a Delaware LLC. To be sure, this court views any form of judicial dissolution as a "limited remedy that [should be] grant[ed] sparingly."[53] Where, as here, a petitioner seeks *equitable* dissolution outside of the grounds enumerated in the Act, such as where a non-member/non-manager seeks dissolution, that petitioner must "explain" in a "convincing manner" why this court should "invoke equitable principles to override the plain language" of the Act and the relevant LLC agreement.[54]

Apparently recognizing that its "lack of formal status as a member or manager" is likely fatal to its bid for dissolution, SolarReserve understandably

---

[51] Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss ("PAB") (D.I. 29) at 10–11; *Trusa v. Nepo*, 2017 WL 1379594, at *6 (Del. Ch. Apr. 13, 2017); *In re Carlisle Etcetera LLC*, 114 A.3d 592, 597 (Del. Ch. 2015) (Section 18-802 "[b]y its terms . . . limits the right to seek statutory dissolution . . . to *members and managers* of an LLC.") (emphasis supplied).

[52] Compl. ¶¶ 65–71. For its part, Tonopah does not challenge whether "this Court has the *jurisdiction* to find equitable standing here." Reply Br. in Further Supp. of Def.'s Mot. to Dismiss the Am. Compl. (D.I. 35) ("DRB") at 5 n.10 (emphasis supplied). Instead, it contends SolarReserve has not "pled facts that would compel the Court to exercise its power under the circumstances." *Id.*

[53] *In re Arrow Inv. Advisors, LLC*, 2009 WL 1101682, at *2 (Del. Ch. Apr. 23, 2009).

[54] *Absalom*, 2019 WL 2655787, at *6.

13

cleaves to *Carlisle*, "the only extant LLC precedent where the Chancery Court has explicitly relied on its constitutionally vested equitable powers" to dissolve a Delaware LLC where the petitioner lacks standing to seek dissolution under the Act.[55] *Carlisle*, however, was a very different case.

Carlisle, a Delaware LLC, had two original members, Tom James Company ("James") and Well Union Capital Limited ("Wu Parent").[56] When the original members formed Carlisle, they "executed a simple form of operating agreement . . . in which they committed to work promptly on a more detailed operating agreement."[57] Shortly after Carlisle's formation, and when business was going well, Wu Parent decided to assign its membership interests to a wholly owned subsidiary for tax purposes.[58] After the assignment, James treated the subsidiary as Carlisle's member.[59] For example, all of Carlisle's tax filings and all subsequent agreements

---

[55] PAB at 11 n.13 (citing *Carlisle*, 114 A.3d 592). SolarReserve makes other arguments in support of dissolution, all of which assume it has overcome its lack of member or manager status as a predicate to seek this extreme remedy. *See, e.g.*, PAB at 13–23 (arguing why it is no longer practicable to achieve Tonopah's stated purpose). While these arguments may have merited consideration if made by a member or manager, they have no bearing on the question of whether the Court should invoke equity on behalf of an outsider to dissolve an entity when neither the member nor manager of the entity seek that relief.

[56] *Carlisle*, 114 A.3d at 594.

[57] *Id.* at 594, 596.

[58] *Id.* at 594.

[59] *Id.*

14

between James, Wu Parent and Carlisle identified the subsidiary as the member, not Wu Parent.[60]

The parties drafted an amended LLC agreement which referred to the subsidiary as Carlisle's member, but "because their relationship seemed amicable, and business matters took precedence," they never got around to executing the amended LLC agreement.[61] Unfortunately, James and Wu Parent's relationship did not remain amicable. Disagreements over management issues eventually led to deadlock.[62]

Despite the managerial disagreements, James was satisfied with the status quo. Four members comprised Carlisle's board of managers (two nominated by each party), yet James had appointed Carlisle's CEO.[63] Since the board of managers was in deadlock, neither party could remove the CEO, leaving James effectively in control of Carlisle because its hand-picked CEO ruled the roost "free of any oversight."[64]

---

[60] *Id.* at 595.

[61] *Id.* at 596.

[62] *Id.*

[63] *Id.*

[64] *Id.* at 594.

Alarmed by these developments, Wu Parent and its subsidiary both petitioned for Carlisle's dissolution.[65] In response, James moved to dismiss, arguing neither Wu Parent nor its subsidiary had standing to seek dissolution since the former had assigned its interest and the latter had never been formally admitted to Carlisle as a member.[66] James pressed these arguments even though it had drafted an agreement referring to the *subsidiary* as Carlisle's member just months before the case began.[67]

The court agreed with James that Wu Parent and the subsidiary had not stated a claim for statutory dissolution.[68] Yet, under the extreme facts alleged, following a thorough and thoughtful explication of the origin and scope of this court's equitable powers, Vice Chancellor Laster held the subsidiary had stated a claim for *equitable* dissolution based on the court's "retain[ed] . . . residual authority" that prevents a Delaware LLC from being "wholly exempt" from judicial oversight.[69] As the court explained, contrary to James' argument, Chancery cannot be divested (by statute or agreement) of its authority to order dissolution "where it appears manifest that equity

---

[65] *Id.* at 597.

[66] *Id.*

[67] *Id.* at 596–97.

[68] *Id.* at 601.

[69] *Id.* at 606 (quoting *In re Revlon, Inc. S'holders Litig.*, 990 A.2d 940, 960 n.8 (Del. Ch. 2010)).

so requires."[70] With this principle, I heartily agree. And I fully endorse *Carlisle*'s application of the principle to the unique facts presented there.

But, again, the facts here bear no resemblance to *Carlisle*. Before drawing the dispositive distinctions, it is useful to bring the question into focus—has SolarReserve pled a set of reasonably conceivable facts "where it appears manifest" that equity must intervene?[71] In this regard, equity has no indurated rules, but it does have many apothegms. "Equity always attempts to ascertain, uphold, and enforce rights and duties which spring from the *real* relations of parties."[72] "Equity regards substance rather than form."[73] Equity also "regards that as done which in good conscience ought to be done."[74] In *Carlisle*, these formulations prompted the court to give effect to the parties' "real relationship" as a "joint venture in which they are equal participants" with neither member intending to be a "passive investor."[75] Critical to the court's analysis were the well-pled facts revealing that James treated

---

[70] *Id.* (citing *Huatuco v. Satellite Healthcare and Satellite Dialysis of Tracy, LLC*, 2013 WL 6460898 (Del. Ch. Dec. 9, 2013), *aff'd*, 93 A.3d 654 (Del. 2014)).

[71] *Id.*

[72] *Id.* at 607 (citing 4 John Norton Pomeroy, *Equity Jurisprudence* § 1333(1) (Spencer W. Symons ed., 5th ed. 1941) (emphasis in original)).

[73] *Id.* (citing *Monroe Park v. Metro. Life Ins. Co.*, 457 A.2d 734, 737 (Del. 1983)).

[74] *Id.* (citing *Monroe Park*, 457 A.2d at 737).

[75] *Id.* (citation omitted).

the subsidiary as a member throughout its course of dealing with Wu Parent, right up to the point where it sought a decree of equitable dissolution.[76]

In contrast, SolarReserve pleads that it made calculated choices to reshape Tonopah's complicated ownership structure in order to secure additional funding.[77] As a result, unlike Wu Parent in *Carlisle*, by virtue of its own choices, and as recognized by all of the entity's constituents, SolarReserve's "*real relationship*" to Tonopah is that of a remote, indirect investor, not a member.[78] The LLC Agreement unambiguously states, "[Holdings is] the sole member of [Tonopah]."[79] If I were to allow SolarReserve to seek Tonopah's dissolution, I would not be "upholding" rights, I would be creating new ones SolarReserve did not bargain for or reasonably expect.[80]

This inescapable reality is further revealed in the fact that SolarReserve's claim to ownership runs through Holdings, which has pledged all of its "right, title and interest in . . . [Tonopah's] limited liability company interests" to a collateral

---

[76] *Id.* at 606.

[77] *See, e.g.*, Compl. ¶¶ 17–18 (describing SolarReserve's decision to give up its sole ownership of Tonopah).

[78] Compl. ¶¶ 17–19.

[79] LLC Agreement at 1 (recitals).

[80] *Carlisle*, 114 A.3d at 607.

agent to secure the DOE Loan.[81]  Now that the DOE has foreclosed under the LGA,

SolarReserve cannot rely on equity to recoup rights it knowingly bargained away.[82]

There is no "manifest" role for equity here; the parties' contract must prevail.[83]

As a last ditch argument, SolarReserve points to provisions in the LLC

Agreement that grant SolarReserve rights like those commonly held by members

and maintains that this somehow reflects an intent to confer member status on

---

[81] Equity Pledge Agreement § 2(a).

[82] At oral argument on the Motion to Dismiss, SolarReserve's counsel represented that Tonopah was operating without "adult supervision" such that no one can hold Tonopah's fiduciaries responsible for hypothetical (but unalleged) breaches of their fiduciary duties. Oral Arg. on Def.'s Mot. to Dismiss the Am. Compl. ("Tr.") (D.I. 43) at 37.  This argument was not clearly articulated in SolarReserve's Answering Brief, but the idea appears to be that Cobra is using its rights at the TSI level to "veto" any efforts SolarReserve makes to hold Cobra and the DOE responsible for alleged wrongdoing, such that dissolution is the only available remedy left for SolarReserve.  Compl. ¶¶ 40–42.  The argument is unpersuasive for several reasons.  *First*, SolarReserve has not brought a claim for breach of fiduciary duty and equity will not support an extraordinary order to dissolve an LLC on the mere speculation that someone may be breaching fiduciary duties.  *See In re Shawe & Elting LLC*, 2015 WL 4874733, at *33 (Del. Ch. Aug. 13, 2015).  *Second*, nothing in this decision prevents SolarReserve from pursing relief at the TSI level to vindicate wrongs TSI's fiduciaries allegedly committed at the Tonopah or Holdings levels.  *See, e.g.*, *Case Fin., Inc. v. Alden*, 2009 WL 2581873, at *7 (Del. Ch. Aug. 21, 2009) (holding that fiduciaries have "a duty not to intentionally . . . participate in conduct that would injure [a parent entity] . . . regardless of how far down the causal chain the injury would occur"). *Finally*, to the extent SolarReserve would seek equitable dissolution based on the wrongdoing of either Cobra or the DOE, both Cobra and the DOE would be necessary parties to this proceeding.  Del. Ct. Ch. R. 19(b).

[83] *Carlisle*, 114 A.3d at 606 (holding the court should invoke equity to overcome a contract only "where it appears manifest that equity so requires"); *Libeau v. Fox*, 880 A.2d 1049, 1056 (Del. Ch. June 16, 2005) ("When parties have ordered their affairs voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement.").

19

SolarReserve in all matters.[84]  By way of example, Section 7.2 gives SolarReserve rights to obtain certain Tonopah books and records.[85]  According to SolarReserve, these provisions create ambiguity concerning its membership status such that it is reasonably conceivable that it may seek dissolution just as a member could.

The fact SolarReserve knew how to retain rights, while giving up others, does not engender a sense that equity is needed here to vest SolarReserve with rights for which it did not bargain.[86]  Tonopah is a "creature[] of contract, [and] I must enforce [its] LLC agreement as written."[87]  The LLC Agreement unambiguously states Tonopah had one "sole member"—which was *not* SolarReserve.[88]  Under these circumstances, SolarReserve cannot swoop in on the wings of equity as if it were a Tonopah member to impose its preferences for the Company's future when it bargained away that status.[89]

---

[84] Tr. at 29.

[85] LLC Agreement §§ 1.1 (definitions of "SolarReserve Sponsor" and "Sponsor Entity"), 7.2.

[86] *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 364 (Del. 2013) (declining to infer that an omission resulted from "sloppy drafting" when an LPA's drafters "knew how to impose an affirmative obligation when they so intended").

[87] *Touch of Italy Salumeria & Pasticceria, LLC v. Basico*, 2014 WL 108895, at *4 (Del. Ch. Jan. 13, 2014).

[88] LLC Agreement at 1 (recitals).

[89] *Norton*, 67 A.3d at 364; *In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d 39, 56 (Del. 2019) (stating that courts "interpret contracts as a whole [by giving] each provision and term effect, so as not to render any part of the contract mere surplusage").

# III. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss must be **GRANTED**.

**IT IS SO ORDERED.**

---

Delaware LLCs respect the principle that "one generally is entitled to select his own business associates in a closely held enterprise." *Achaian, Inc. v. Leemon Family LLC*, 25 A.3d 800, 804 n.14 (Del. Ch. 2011). That the LLC Agreement's drafters opted to include "choose your partner" provisions is yet another factor weighing against SolarReserve's right to seek dissolution. LLC Agreement §§ 3.5, 8.1.