**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| IN RE: FACEBOOK, INC. DERIVATIVE LITIGATION | ) ) | **CONSOLIDATED** **CA. No. 2018-0307** |

## ORDER ESTABLISHING LEADERSHIP STRUCTURE

**WHEREAS:**

**A.** Two competing teams of stockholder plaintiffs and counsel seek to be appointed to leadership roles in this consolidated derivative action that is proposed to be brought on behalf of nominal defendant, Facebook, Inc. (or the "Company").

**B.** Under one proposal, California State Teachers' Retirement System ("CalSTRS"), City of Birmingham Retirement and Relief System ("Birmingham") and Construction and General Building Laborers' Local Union No. 79 General Fund ("Local 79") would serve as co-lead plaintiffs. Kaplan Fox & Kilsheimer LLP, Prickett, Jones & Elliott, P.A., and Scott+Scott Attorneys at Law would serve as co-lead counsel. This team of litigants and counsel shall be referred to collectively as the "CalSTRS Group."

**C.** Under the other proposal, Employees' Retirement System of Rhode Island and City of Warwick Retirement System would serve as co-lead plaintiffs. Block & Leviton LLP would serve as lead counsel, and Heyman, Enerio, Gattuso & Hirzel LLP would serve as additional Delaware counsel. This team of litigants and counsel shall be referred to collectively as the "RI Group."

1

**D.** When faced with a leadership dispute, the court's task is to "establish a leadership structure that will provide effective representation."[1] To that end, the court weighs the so-called "*Hirt* factors," so named after *Hirt v. U.S. Timberlands Service Company, LLC*.[2] The six factors can be paraphrased as follows:

i. the quality of the pleading that appears best able to represent the interests of the shareholder class and derivative plaintiffs;

ii. the relative economic stakes of the competing litigants in the outcome of the lawsuit;

iii. the willingness and ability of all the contestants to litigate vigorously on behalf of an entire class of shareholders;

iv. the absence of any conflict between larger, often institutional, stockholders, and smaller stockholders;

v. the enthusiasm or vigor with which the various contestants have prosecuted the lawsuit; and

vi. the competence of counsel and their access to the resources necessary to prosecute the claims at issue.[3]

**E.** The *Hirt* factors provide guidance, but they are not a "scorecard."[4] "A plaintiff's firm does not 'win' the lead counsel spot by accumulating the most

---

[1] *In re Del Monte Foods Co. S'holders Litig.*, 2010 WL 5550677, at *6 (Del. Ch. Dec. 31, 2010).

[2] 2002 WL 1558342 (Del. Ch. July 3, 2002).

[3] *See id.* at *2.

[4] *In re Delphi Fin. Gp. S'holder Litig.*, 2012 WL 424886, at *1 (Del. Ch. Feb. 7, 2012).

'points,' as it might by demonstrating that its client owns the most shares or that it has litigated the most [*Caremark*] cases. Instead, each factor is given weight only to the extent that it bears on the ultimate question of what is in the best interests of the plaintiff class."[5]

**F.** For purposes of analysis, Delaware courts often group the *Hirt* factors into categories based on whether they focus more closely on the proposed lead plaintiff or the proposed lead counsel.[6]

**1.** Factors (ii) and (iv) address attributes of the proposed lead plaintiff. Factor (ii) considers whether the economic stake of the proposed plaintiff is relatively significant, likely leading to meaningful monitoring and reduced agency costs. Factor (iv) asks whether there are any particular attributes of the proposed plaintiff, such as unique defenses or potentially divergent interests, that could diminish the plaintiff's effectiveness.

**2.** Factors (i), (v), and (vi) address aspects of the proposed lead counsel's ability to provide effective representation. Factors (i) and (v) look at two objective indicia of counsel's ability based on their actions in the specific case—the pleading on which the law firm proposes to litigate and how counsel has acted in the case to date. Factor (vi) calls on the court to consider more generally which law firm is best qualified to handle the matter.

**3.** Factor (iii) blends the consideration of the law firm and the proposed lead plaintiff by requiring the court to consider how the litigation is likely to unfold and whether the proposed leadership team will operate effectively.

---

[5] *Id.*

[6] *E.g.*, *Del Monte Foods*, 2010 WL 5550677, at *6 (noting that the factors are divided to "examine both the proposed lead counsel and the proposed named plaintiff").

Upon applying the *Hirt* factors to the competing applications for leadership in this case, it appears to the Court that:

1.      The CalSTRS Group and the RI Group are closely matched. Both groups are highly qualified and capable of litigating the case.

2.      The lead plaintiff factors (ii) and (iv) do not materially favor either group.

   a.      Factor (ii) asks the Court to consider the relative economic stakes of the competing litigants in the lawsuit's outcome. This court only accords "great weight" to "substantial relative difference[s]" in the movants' economic stakes; it does not "simply add up the number of shares and select the law firm with the largest absolute representation."[7]   While "*Hirt* stands for the proposition that *relative* economic stakes are given great weight, not simply economic stakes,"[8] Delaware courts have also recognized that the "potential upside" of a large stockholder will typically "align its incentives with the rest of the class."[9]

---

[7] *See Wiehl v. Eon Labs*, 2005 WL 696764, at *3 (Del. Ch. Mar. 22, 2005).

[8] *Id.*

[9] *Ryan v. Mindbody, Inc.*, 2019 WL 4805820, at *3 (Del. Ch. Oct. 1, 2019).

**b.** Here, the CalSTRS Group collectively owns about 4.5 million shares of Facebook common stock.[10] The RI Group owns about 160,000 shares.[11] Although the CalSTRS Group owns more than 28 times the RI Group's shares, both plaintiffs own diversified portfolios that are not disproportionately weighted towards Facebook. And, of course, neither of the putative lead plaintiffs owns a significant percentage of Facebook's outstanding stock relative to the public float, a fact not at all surprising given that Facebook is one of the largest companies in the world. The RI Group owns about 0.005%, and the CalSTRS Group owns less than 0.2%.[12] Thus, even though the CalSTRS Group holds substantially more shares than the RI Group, the *relative* economic stake of each group—as a percentage of their portfolios and of Facebook's outstanding shares—is not materially different. Moreover, both parties own "a sufficient stake to provide an economic incentive to monitor counsel and play a meaningful role in conducting the case."[13]

---

[10] Appl. for Appointment of Lead Pls. and Co-Lead Counsel by Pls. CalSTRS, Local 79, and Birmingham (D.I. 196) (C.A. 2018-0307) at 4.

[11] Verified S'holder Deriv. Compl. ("R.I. Compl.") (D.I. 1) (C.A. 2021-0617-JRS) ¶¶ 19–20.

[12] R.I. Gp.'s Opp'n to Appl. for Appointment of Lead Pls. and Co-Lead Counsel by Pls. CalSTRS, Local 79, and Birmingham ("R.I. Opp'n") (D.I. 211) at 3.

[13] *In re Revlon, Inc. S'holders Litig.*, 990 A.2d 940, 955 (Del. Ch. 2010).

**c.** Factor (iv) asks if there is any conflict between larger and smaller stockholders. Neither party has alleged a stockholder conflict as between "large and small" Facebook stockholders, or that either contestant has any interest that would diverge from the class.

**3.** The lead counsel factors favor the CalSTRS Group.

**a.** Factor (i) evaluates the quality of the pleading that appears best able to represent the interests of the shareholder class and derivative plaintiffs. Both groups filed large and extremely thorough complaints that would support meaningful litigation. As is often the case in these difficult decisions, "[b]oth complaints reflect investigative effort and craftsmanship expected of competent plaintiff's counsel engaged in representative litigation of this Court."[14]

**b.** In analyzing this factor, this court has often favored the movant who has utilized Section 220 documents more effectively or provided more factual fodder to support its claims.[15] Here, however, both contestants have properly utilized Section 220 documents and have revealed their extensive investigative efforts in thoroughly pled complaints, although the Court notes that both parties rely more heavily on the CalSTRS Group's Section 220 documents.

---

[14] *In re Investors Bancorp, Inc. S'holder Litig.*, 2016 WL 4257503, at *4 (Del. Ch. Aug. 12, 2016).

[15] *See, e.g.*, *id.* at *4–5 (citing cases).

**c.** Both complaints span hundreds of pages. While the pleadings share a similar girth, they do not reflect shared strategic decisions as evidenced by the claims asserted. The CalSTRS Group pleads many claims, including a *Caremark* claim against the entire Board and a *Brophy* insider trading claim that, if proven, would recover tens of billions of dollars on behalf of the Company.[16] In contrast, the RI Group alleges a strong entire fairness claim, sets forth strong lack-of-independence allegations, and asserts a claim against Palantir Technologies, Inc. that is not asserted by the CalSTRS Group.[17] The entire fairness claim is tailored to focus on the $5 billion FTC settlement agreed to by Facebook, which the RI Group alleges was a transaction entered into by Facebook at an unfair price, following an unfair process, for the purpose of benefitting certain Facebook insiders.[18] In other words, while the CalSTRS Group pleads wide-reaching claims against many defendants, the RI Group primarily focuses on the event they believe best typifies fiduciary misconduct that can be challenged under a plaintiff-friendly standard of review.

---

[16] *Brophy v. Cities Serv. Co.*, 70 A.2d 5 (Del. Ch. 1949).

[17] Palantir Technologies, Inc. is a software company co-founded by defendant Peter Thiel. R.I. Compl. ¶ 14. The RI Group's complaint brings a derivative claim against Palantir for violation of California's unfair competition law. R.I. Compl. ¶¶ 439–45. It alleges that Palantir deceptively and unlawfully obtained and retained data from Facebook users without their knowledge and consent. R.I. Compl. ¶ 441.

[18] R.I. Compl. ¶¶ 417, 423–25, 429–31, 435–37.

**d.** The RI Group is to be commended for its thoughtful and tailored complaint. But, in my view, the CalSTRS Group's complaint is simply more comprehensive. Although "[t]he bigger complaint is not always the better complaint,"[19] the CalSTRS Group's complaint contains broader allegations against Facebook's executives and Board of Directors (the "Board"). Moreover, it pleads several ways to overcome the formidable standard for demand futility. While the RI Group's complaint makes a strong case that the Board lacks independence from defendant Zuckerberg, should its theory fail, there is no alternative path to demand futility that would allow Facebook stockholders to overcome a pleading stage challenge under Chancery Rule 23.1. In contrast, the CalSTRS Group's complaint provides for several avenues to overcome demand futility, including the entire fairness/lack of independence theory proffered by the RI Group.[20]

**e.** At oral argument, the RI Group claimed its complaint is superior because it focuses on the correct Board members in arguing that the Board could not give disinterested and independent consideration to a demand (the "Demand Board"). Yet the CalSTRS Group makes allegations against all the Board members identified by the RI Group and then some. In other words, the RI Group argues it

---

[19] *In re Investors Bancorp*, 2016 WL 4257503, at 4.

[20] R.I. Gp.'s Leadership Appl. ("R.I. Appl.") (D.I. 195) (C.A. 2018-0307) at 8 (acknowledging that the CalSTRS Group has pled an entire fairness claim).

has identified and targeted claims against the correct Demand Board, whereas the CalSTRS Group brings allegations against all the potentially relevant Demand Board members under various theories. To be sure, the RI Group might make more detailed allegations against certain Board members, but the CalSTRS Group casts a wider net to impugn the disinterestedness or independence of a greater number of Board members in recognition that the composition of the Demand Board may be disputed. Trade-offs such as these are the inevitable product of competing complaints; they do not reveal that the RI Group's complaint is superior.

**f.** Because the CalSTRS Group's complaint is more comprehensive and contains more pathways to recovery, I am satisfied it provides Plaintiffs the best opportunity to succeed. Factor (i) weighs in the CalSTRS Group's favor.

**g.** Factor (v) asks the Court to evaluate the enthusiasm or vigor with which the various contestants have prosecuted the lawsuit. Both sets of counsel have pursued this litigation diligently. Both have utilized Section 220 litigation to improve their claims. Although the CalSTRS Group entered this litigation earlier, "[t]o avoid rushes to the courthouse, this Court accords no special weight or status to the first-filing plaintiff."[21] This factor does not favor either party.

---

[21] *In re Kraft Heinz Co. Deriv. Litig.*, 2020 WL 1248471, at *2 (Del. Ch. Mar. 13, 2020) (ORDER).

**h.** Factor (vi) asks the Court to assess the competence of counsel and their access to the resources necessary to prosecute the claims at issue. All counsel involved in this dispute are highly competent, well-funded and very well regarded by the Court.

**i.** The RI Group argues that counsel for the CalSTRS plaintiffs is fatally conflicted by virtue of having pursued direct claims against Facebook and, therefore, cannot competently represent the CalSTRS Group. After careful review of the supposedly conflicted cases, I am satisfied there is no conflict that would prevent counsel from properly representing the CalSTRS Group.

**i.** The RI Group specifically identifies several ongoing cases where Kaplan Fox and Scott+Scott represent plaintiffs suing Facebook directly.[22] Given this dynamic, they argue that the CalSTRS Group's counsel cannot represent Facebook derivatively. As this court has recognized, there is a potential for conflict when a law firm seeks to represent both a derivative plaintiff on behalf of a corporation and a class plaintiff in direct litigation against the same corporation, but that is not always the case.[23] Indeed, Vice Chancellor Noble confronted a similar

---

[22] R.I. Opp'n at 1–2.

[23] *E.g., In re Ebix, Inc. S'holder Litig.*, 2014 WL 3696655, at *18 (Del. Ch. July 24, 2014) (stating that bringing both direct and derivative claims did not amount to a "disabling conflict"); *In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at *2 (Del. Ch. Mar. 28, 2018) (allowing plaintiffs and their counsel to bring both direct and derivative claims in the same action). *But see In re Duke Energy Corp. Deriv. Litig.*, 7705-CS (Del. Ch. Dec. 21, 2012) (TRANSCRIPT), at 27 ("[W]hen it comes to . . . third-party suits

issue in *In re Ebix* and determined that there was no potential for a "disabling conflict because the claims [were] not internally inconsistent."[24]  After reviewing the direct claims asserted by the CalSTRS Group's counsel against Facebook, I am persuaded that counsel is not asserting claims in those cases that are internally inconsistent with the claims being asserted in this derivative action, or vice versa.

**ii.**  The RI Group's citation to *In re Towers Watson & Co. Shareholder Litigation* does not alter the outcome.[25]  There, then-Vice Chancellor Montgomery-Reeves chose not to pick the contestant who was the lead plaintiff and lead counsel in securities litigation and an appraisal action against the derivative nominal defendant, where the direct claims were closely related to the putative derivative claims, because of the "potential for conflicts."[26]  *Towers Watson* is distinguishable on two grounds.  First, serving as lead counsel and lead plaintiff in both securities litigation and an appraisal action regarding the same subjects that are the gravamen of the derivative claims presents a far greater risk of conflict than is presented here.  Second, the court in *Towers Watson* believed there were "no real

---

against your company . . . you cannot simultaneously be a derivative plaintiff and then be rooting for the third party to win.").

[24] *In re Ebix*, 2014 WL 3696655, at *18.

[25] 2018-0132-TMR (Del. Ch. June 5, 2018) (TRANSCRIPT) (cited in R.I. Appl. Ex. L).

[26] *Id.* at 63.

determinative differences between the contestants" under the *Hirt* factors, and the court used the potential for conflicts essentially as a tiebreaker.[27] In this regard, the court observed, "[w]hile the potential conflicts raised here may well not amount to disabling conflicts, with two such equally matched choices, I'm going to pick the counsel and the plaintiff that minimizes the potential for distracting motion practice in the future."[28] Here, the *Hirt* factors favor the CalSTRS Group and I am not persuaded that the very remote potential for conflicts overrides the CalSTRS Group's superior application such that the Company and its stockholders should be deprived of the strengths of the CalSTRS Group's complaint.

      **iii.**    I trust that the CalSTRS Group will prosecute this case fairly and vigorously. I note, however, that even after lead counsel has been selected, the Court must continue to monitor the adequacy of counsel's representation.[29] Should any potential conflicts arise, the Court can make necessary adjustments at that time, if needed.

---

[27] *Id.*

[28] *Id.*

[29] 2 Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery*, § 13.02, 13-9 (2d. ed. 2020); *cf. In re Revlon*, 990 A.2d at 955 ("A trial court has a continuing duty in a class action case to scrutinize the class attorney to see that he or she is adequately protecting the interests of the class, and if at any time the trial court realizes that class counsel should be disqualified, the court is required to take appropriate action.") (internal quotation marks omitted).

**4.** Factor (iii) asks the Court to examine the willingness and ability of the contestants to litigate vigorously on behalf of the class of stockholders they seek to represent. Both contestants here (plaintiffs and counsel) have exhibited a willingness to litigate this case fully and effectively. This factor is a wash.

**5.** Although the competing applications for leadership present a close call, because the CalSTRS Group's complaint is superior, it has presented the better application.

**6.** CalSTRS, Birmingham, and Local 79 are hereby designated as Co-Lead Plaintiffs.

**7.** The law firms of Kaplan Fox & Kilsheimer LLP, Prickett, Jones & Elliott, P.A., and Scott+Scott Attorneys at Law are hereby designated as Co-Lead Counsel.

**8.** Hach Rose Schirripa & Cheverie LLP and Dilworth Paxson LLP are hereby designated as Co-Chairs of an Executive Committee of shareholders. The additional members of the Executive Committee are Robbins LLP, Gainey McKenna & Egleston, Berman Tabacco and Cotchett Pitre & McCarthy LLP.

**9.** Co-Lead Counsel shall set policy for the prosecution of this litigation, delegate and monitor the work performed to ensure there is no duplication of effort or unnecessary expense, and initiate and coordinate the activities of counsel.

**10.** Co-Lead Counsel shall have the power and responsibility, with input from the Executive Committee, to: coordinate and direct the preparation of pleadings; coordinate and direct the briefing and argument of motions; coordinate and direct the conduct of discovery and other pretrial proceedings; conduct any and all settlement negotiations with counsel for the Defendants; coordinate and direct the preparation for trial of this matter, and delegate work responsibilities to selected counsel as may be required; and coordinate and direct any other matters concerning the prosecution or resolution of the consolidation action.

**11.** Co-Lead Plaintiffs shall file a consolidated complaint within thirty days of this Order, which shall serve as the operative complaint.

**IT IS SO ORDERED.**

Dated: October 5, 2021

_____*/s/ Joseph R. Slights III*_____
Vice Chancellor