**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

LORI W. WILL
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

September 29, 2025

Gregory V. Varallo, Esquire
Benjamin M. Potts, Esquire
Margaret Rockey, Esquire
Bernstein Litowitz Berger
  & Grossmann LLP
500 Delaware Avenue, Suite 901
Wilmington, Delaware 19801

Ned Weinberger, Esquire
Brendan W. Sullivan, Esquire
Labaton Keller Sucharow LLP
222 Delaware Avenue, Suite 1510
Wilmington, Delaware 19801

Michael J. Barry, Esquire
Christine M. Mackintosh, Esquire
Vivek Upadhya, Esquire
Grant & Eisenhofer P.A.
123 Justison Street
Wilmington, Delaware 19801

> RE: *In re Endeavor Group Holdings, Inc. Stockholders' Litigation*,
> C.A. No. 2025-0663-LWW

Dear Counsel:

This decision resolves a leadership dispute in a consolidated class action lawsuit about a take-private merger. The first plaintiff group consists of two institutional investors with substantial equity holdings. The second is a retail stockholder with a nominal investment. Counsel for both factions are highly qualified.

Despite the huge disparity in the two groups' ownership, the choice between them is not straightforward. Each side has a notable shortcoming. The retail stockholder's trivial stake provides little incentive to effectively oversee the lawsuit. Meanwhile, the larger of the two institutional investors bought its shares just before the merger closed, suggesting it is a litigation arbitrageur rather than an aggrieved stockholder.

If the choice were confined to the retail stockholder and larger institutional investor, I would face a dilemma. But the smaller institutional investor, which acquired a considerable stake before the merger was announced, serves as the tiebreaker. It is well positioned to press forward should its co-lead plaintiff prove problematic at a later stage.

The institutional investors' leadership application is therefore granted, and the retail stockholder's application is denied.

## I.     RELEVANT FACTS

This lawsuit concerns the going-private merger of Endeavor Group Holdings, Inc., a sports and entertainment company. Global private equity firm Silver Lake acquired the outstanding shares of Endeavor it did not already own for $27.50 per share. Now-privately held Endeavor retains its majority ownership of TKO Group

Holdings, Inc.—the publicly traded parent of Ultimate Fighting Championship and World Wrestling Entertainment.

The merger was announced on April 2, 2024, drawing the interest of multiple stockholder plaintiffs. Shortly after the announcement, several individuals served books and records demands on Endeavor, with one stockholder filing a Section 220 lawsuit.[1]

After the merger closed on March 24, 2025, Endeavor stockholders began filing statutory appraisal actions en masse. The appraisal actions were consolidated in April. Contested motions for lead counsel and lead plaintiff were resolved in July.[2]

Two putative class action lawsuits were also filed—the first in April 2024, shortly after the merger was announced, and the second in June 2025. At a high level, the plaintiffs alleged that Silver Lake and Endeavor insiders breached their fiduciary duties by undervaluing Endeavor to advantage themselves at the expense

---

[1] *See* Garcia's Mot. to Consolidate and for Appointment of Lead Pl. and Co-Lead Counsel (Dkt. 5) ("Garcia Gp. Mot.") ¶ 8; Icahn Enterprises/Handelsbanken Gp.'s Resp. to Garcia's Mot. for Appointment of Lead Pl. and Co-Lead Counsel (Dkt. 33) ("Icahn/Handelsbanken Gp. Resp.") ¶ 11; *Horowitz v. Endeavor Gp. Hldgs., Inc.*, C.A. 2025-0241-RUA (Del. Ch. Mar. 5, 2025).

[2] *See In re Appraisal of Endeavor Gp. Hldgs., Inc.*, 2025 WL 2049042, at *1 (Del. Ch. July 22, 2025).

of public stockholders. The cases were consolidated in July.[3] Now, former Endeavor stockholders and their counsel are vying for leadership positions in this consolidated putative class action.

The first leadership motion is brought by Icahn Enterprises LP, Icahn Partners LP, Icahn Partners Master Fund LP (together, "Icahn Enterprises"), and Handelsbanken Fonder AB.[4] They ask to be appointed co-lead plaintiffs, and that their counsel—Bernstein Litowitz Berger & Grossmann LLP and Grant & Eisenhofer P.A. (together, the "Icahn/Handelsbanken Group")—be appointed co-lead counsel, with Woolery & Co. PLLC and Equity Litigation Group LLP serving as additional counsel.

The second leadership motion is brought by Ricardo Garcia.[5] He seeks the lead plaintiff role for himself, and a lead counsel role for Labaton Keller Sucharow LLP and Friedman Oster & Tejtel PLLC (together, the "Garcia Group"), with

---

[3] *See* Order Consolidating Class Actions (Dkt. 17).

[4] *See generally* Icahn Enterprises/Handelsbanken Gp.'s Mot. and Appl. for Appointment of Lead Pls. and Lead Counsel (Dkt. 27) ("Icahn/Handelsbanken Gp. Mot."); Icahn/Handelsbanken Gp. Resp. Handelsbanken Fonder AB is an asset management company that is a wholly owned subsidiary of Svenska Handelsbanken AB—a Nordic bank. *See Subsidiaries*, Handelsbanken, https://www.handelsbanken.com/en/about-the-group/organisation/subsidiaries (last visited Sept. 26, 2025).

[5] *See generally* Garcia Gp. Mot.; Garcia's Resp. in Further Supp. of Mot. for Appointment of Lead Pl. and Co-Lead Counsel (Dkt. 32) ("Garcia Gp. Resp.").

Saxena White P.A., Kessler Topaz Meltzer & Check LLP, and Kaskela Law LLC

serving as additional counsel.

## II.    ANALYSIS

The Court of Chancery Rule 23(d)(4)(A) factors guide the court in setting a

leadership structure for a class action.[6]  The factors are:

> (i) counsel's competence and experience; (ii) counsel's access to
> the resources necessary to represent the class; (iii) the quality of
> the pleading; (iv) counsel's performance in the litigation to date;
> (v) the proposed leadership structure; (vi) the relative economic
> stakes of the representative parties; (vii) any conflicts between
> counsel or the representative parties and members of the class;
> and (viii) any other matter pertinent to the ability of counsel or
> the representative party to fairly and adequately represent the
> interests of the class.[7]

Rule 23(d) supplies "guideposts," not a "scorecard."[8]  "A proposed leadership team

does not 'win' appointment by being marginally better than the competition in a

plurality of the factors."[9]  Because the court employs a "nuanced and case-specific"

---

[6] Ct. Ch. R. 23(d)(4)(A).

[7] *Id.*

[8] *In re Delphi Fin. Gp. S'holder Litig.*, 2012 WL 424886, at *1 (Del. Ch. Feb. 7, 2012).

[9] *In re Fox Corp. Deriv. Litig.*, 307 A.3d 979, 988 (Del. Ch. 2023).

approach, some factors may take precedence over others.[10] The court's ultimate task is to "establish a leadership structure that will provide effective representation."[11]

## A. Neutral Factors

Applied here, several of the Rule 23(d) factors are neutral. They are: "counsel's competence and experience"; "counsel's access to the resources necessary to represent the class"; "the quality of the pleading"; and "counsel's performance in the litigation to date."[12] Each factor is positive but balanced between the competing groups.

### 1. Counsel's Experience and Resources

The Icahn/Handelsbanken Group and the Garcia Group are populated by exceptional attorneys. All are well known to the court and possess the competence, experience, and resources necessary to prosecute this case effectively.

---

[10] *In re Del Monte Foods Co. S'holders Litig.*, 2010 WL 5550677, at *6 (Del. Ch. Dec. 31, 2010); *see Sunrise P'rs Ltd. P'ship v. Rouse Props., Inc.*, 2016 WL 7188104, at *6 (Del. Ch. Dec. 8, 2016).

[11] *Del Monte*, 2010 WL 5550677, at *6.

[12] Ct. Ch. R. 23(d)(4)(A)(i)-(iv).

The Garcia Group has successfully partnered on prior matters and achieved significant, even unprecedented, stockholder recoveries.[13] It is led by attorneys who are thorough, thoughtful, and forthright. They have achieved success while navigating novel territory against skilled adversaries.[14]

The Icahn/Handelsbanken Group likewise has a "track record of success" from partnerships in past cases.[15] The team is composed of experienced lawyers with "complementary skill sets, specialties, and backgrounds."[16] Proposed additional counsel bring unique expertise, with one principal having served as Co-Head of J.P. Morgan's Mergers & Acquisitions group and another having worked as a Morgan Stanley equity analyst.[17]

2. Quality of the Pleadings and Participation

The quality of a complaint reflects counsel's diligence and competence. Both complaints advance carefully researched legal theories. Each side concedes that the

---

[13] Garcia Gp. Mot. ¶ 30; *see id.* at Exs. 3-4 (listing prior recoveries); *see also In re Dell Techs. Inc. Class V S'holders Litig.*, 300 A.3d 679, 725 (Del. Ch. 2023) (praising the "unprecedented result" obtained by plaintiff's counsel).

[14] *E.g.*, *Dell*, 300 A.3d at 728 (describing the plaintiff's counsel's "novel valuation approaches" and "novel questions about market expectations and minority discounts").

[15] Icahn/Handelsbanken Gp. Mot. ¶ 6.

[16] *Id.* ¶ 21 (quoting *Fox*, 307 A.3d at 993).

[17] *Id.* ¶ 22.

other's complaint faces no "material risk from dispositive motion practice."[18] And though there are distinctions between the two complaints,[19] they do not meaningfully differ in quality.

Both groups also have the benefit of documents produced during pre-suit investigations. Garcia personally pursued a Section 220 demand, which is a positive factor. At the same time, Icahn Enterprises and Handelsbanken had access to Section 220 materials by coordinating with other plaintiffs who served demands.

### B. Diverging Factors

Other Rule 23(d) factors point in different directions. On the one hand, Icahn Enterprises and Handelsbanken's disproportionately larger financial interest weighs against Garcia's appointment. On the other hand, Garcia has raised important questions about Icahn Enterprises' suitability to serve as a class representative. Neither concern applies to Handelsbanken.

---

[18] *Id.* ¶ 14; Garcia Gp. Resp. ¶ 6.

[19] For instance, Garcia's complaint notes the rise in TKO's post-announcement stock price and makes related allegations about the lack of a collar or "other protection[] that would have allowed minority stockholders to share in TKO's expected stock price increases." Garcia Verified Compl. (Dkt. 1) ¶¶ 24, 286. Icahn Enterprises and Handelsbanken's complaint raises allegations aimed at a "closing date valuation" that they believe "bolster[s] the [c]lass's ability to obtain a quasi-appraisal remedy." Icahn/Handelsbanken Gp. Mot. ¶ 5 (quoting Icahn/Handelsbanken Second Am. Verified Compl. (Dkt. 18) ¶¶ 232, 257-63).

1.    Relative Economic Stakes

"[T]he relative economic stakes of the competing litigants in the outcome of the lawsuit" are "to be accorded 'great weight.'"[20]  This factor is not determinative but appropriately prioritized where, as here, a "substantial relative difference" exists between the factions' financial interests.[21]   The two groups' Endeavor equity positions differ by orders of magnitude.

Icahn Enterprises and Handelsbanken are large institutional investors that held a combined 27.5 million Endeavor shares, valued at approximately $757 million at the deal price.[22]   Garcia is a retail investor that had 27 shares of Endeavor stock, worth less than $750 at the deal price.[23]   Icahn Enterprises and Handelsbanken's collective interest is more than one million times larger than Garcia's.

I commend Garcia for stepping forward as a plaintiff despite the limited upside he could realize.  Still, this court must tread cautiously when a stockholder

---

[20] *Hirt v. U.S. Timberlands Serv. Co.*, 2002 WL 1558342, at *2 (Del. Ch. July 3, 2002) (citation omitted).

[21] *Wiehl v. Eon Labs*, 2005 WL 696764, at *3 (Del. Ch. Mar. 22, 2005); *see also Delphi*, 2012 WL 424886, at *3 (finding this factor "immaterial" where the investor groups "each own[ed] a relatively small stake").

[22] Icahn/Handelsbanken Gp. Mot. ¶ 2.

[23] Garcia Gp. Mot. ¶ 33.

with a de minimis interest seeks to lead a significant representative action. An inverse relationship between agency cost problems and the plaintiff's financial stake can emerge.

A lead plaintiff is a fiduciary with a duty to monitor counsel and ensure the litigation benefits all class members. A representative with a trivial investment, however, has little reason to perform this role because her personal wealth is unaffected by the outcome.[24] The plaintiff's economic indifference creates a vacuum, increasing the risk that her lawyers, whose financial interests can diverge from those of the class, drive the litigation.[25]

By contrast, a lead plaintiff with a substantial economic stake is incentivized to bridge this gap. Having more to gain provides a powerful motive to supervise counsel and secure a favorable outcome. An institutional investor may also be well

---

[24] *See Delphi*, 2012 WL 424886, at *3 ("The 'economic stake' factor recognizes that the plaintiff with the most at stake typically has the greatest incentive to monitor counsel and ensure effective prosecution of the lawsuit."); *Dutiel v. Tween Brands, Inc.*, 2009 WL 3494626, at *3 (Del. Ch. Oct. 28, 2009) (discussing "the significance of an individual's stake in the litigation and the resulting incentive the individual has to participate in the litigation and monitor his or her counsel").

[25] *See, e.g.*, *Del Monte*, 2010 WL 5550677, at *7; *see also* John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions*, 86 COLUM. L. REV. 669, 677-80 (1986) (discussing agency costs when attorneys are the true principals in representative suits).

suited to devote the skill and resources needed for strategic decision-making. This alignment of interests can reduce agency costs.[26]

With minimal personal exposure, Garcia lacks an inducement to adequately oversee five law firms. Conversely, Icahn Enterprises and Handelsbanken are financially motivated to guide counsel toward a result that benefits the entire class. This inequality overwhelmingly favors the Icahn/Handelsbanken Group.

### 2.    Potential Conflicts

The Garcia Group's main critique of its competitor brings other policy concerns to the fore. It accuses Icahn Enterprises of claim-buying. Specifically, it asserts that Icahn Enterprises may lack standing or be subject to unique defenses because its Endeavor shares were purchased months after the merger announcement.

---

[26] *See In re Revlon, Inc. S'holders Litig.*, 990 A.2d 940, 955 (Del. Ch. 2010) ("[T]he weight given to the size of a plaintiffs' holding is not used to generate a formalistic ranking, but rather comes into play when a plaintiff owns a sufficient stake to provide an economic incentive to monitor counsel and play a meaningful role in conducting the case."); *cf.* Elliott J. Weiss & John S. Beckerman, *Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions*, 104 YALE L.J. 2053, 2126 (1995) (arguing that institutional investors in securities class actions would serve as more "effective litigation monitors" because their "stake in the outcome of class actions would give them an incentive to do that job well"); *In re Mersho*, 6 F.4th 891, 901 n.3 (9th Cir. 2021) (noting that the PSLRA presumes that "investors with the largest stake have the greatest incentive to supervise the litigation closely").

Icahn Enterprises' last-minute investment did not necessarily deprive it of standing. A direct claim challenging a merger's fairness "travels with the shares."[27] That is, a buyer of stock gains the right to assert and recover on direct claims regarding pre-purchase conduct.[28]

The more nuanced question is whether Icahn Enterprises is subject to a unique defense that could disqualify it as class representative. Stockholders who buy shares after the transaction's announcement may be atypical under Rule 23(a)(4) because the alleged "wrongful act" is the "fixing of the terms of the transaction"—not closing.[29]

---

[27] *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1044, 1050 (Del. Ch. 2015).

[28] *See Urdan v. WR Cap. P'rs, LLC*, 244 A.3d 668, 679 (Del. 2020) (holding that the sale of stock transferred the "rights to continue to pursue" breach of fiduciary duty claims to the purchaser); *see also In re Prodigy Commc'ns Corp. S'holders Litig.*, 2002 WL 1767543, at *4 (Del. Ch. July 26, 2002) ("[W]hen Beoshanz sold his shares in the marketplace, the claim relating to the fairness of the then-proposed transaction passed to his purchaser, who enjoyed the benefits of the settlement."); *In re Triarc Cos.*, 791 A.2d 872, 879 (Del. Ch. 2001) (describing how stockholders who "sever their economic relationship with the corporation" are "viewed as having sold their interest in the claim with their shares"); *see also In re Sunstates Corp. S'holder Litig.*, 2001 WL 432447, at *3 (Del. Ch. Apr. 18, 2001).

[29] *See Dieter v. Prime Comput., Inc.*, 681 A.2d 1068, 1072-73 (Del. Ch. 1996) (holding that the "spectre of the defense" prompted by the plaintiffs' purchase of stock after a merger announcement "disqualif[ied] [them] as appropriate class representatives" because they were "not typical of the class which owned [the company's] stock before the announcement" of the deal (citing *Brown v. Automated Mktg. Sys., Inc.*, 1982 WL 8782, at *2 (Del. Ch. Mar. 22, 1982))). In *In re Celera Corp. Shareholder Litigation*, the Delaware

Icahn Enterprises' typicality is not, however, presently before me. My current task amounts to a case management decision under Rule 23(d).[30] A Rule 23(a) class certification analysis comes later.[31]

There may be merit to the Garcia Group's concern that Icahn Enterprises' belated investment carries suboptimal ramifications.[32] But there is a crucial

---

Supreme Court cautioned that *Dieter* does not provide that a mere "*potential* argument that a class representative lacks standing without reaching the merits of such an argument . . . renders that class representative unfit to represent the class." 59 A.3d 418, 430 (Del. 2012) (emphasis added). Instead, the court emphasized that "*Dieter* involved class representatives who purchased their shares well after the proposed merger at issue had been announced." *Id.*

[30] *See, e.g.*, *Silverstein v. Warner Commc'ns, Inc.*, 1991 WL 12835, at *2 (Del. Ch. Feb. 5, 1991) (discussing that in some complex lawsuits, it may become "necessary for the court to manage class litigation to the extent of designating lead counsel" (quoting 5C Wright & Miller, *Federal Practice & Procedure* § 1206 (1990))); *see also Del Monte*, 2010 WL 5550677, at *7 ("In balancing the *Hirt* factors, I need not determine . . . whether [the potential class representative] can satisfy the requirements of Rule 23 . . . ."). The Court of Chancery's general practice is to implement a leadership structure before class certification. *E.g.*, *Revlon*, 990 A.2d at 955. Although there may be some overlap in the analyses, conflating them would make it illogical to have separate procedures under Rule 23(a) and Rule 23(d).

[31] *See supra* note 30. Even at the class certification stage, the "existence of unique defenses do[es] not necessarily render the claims of a specific plaintiff atypical of the larger class." *O'Malley v. Boris*, 2001 WL 50204, at *4 (Del. Ch. Jan. 11, 2001); *cf.* 1 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 3:45 (6th ed.) ("Only if the unique defense is likely to be a 'major focus' of the litigation may the proposed representative's claims be rendered atypical.").

[32] As Garcia's counsel warned at oral argument, leadership positions should not be "up for sale." Tr. of Aug. 7, 2025 Oral Arg. on Mots. for Appointment of Lead Counsel and Co-Lead Counsel (Dkt. 43) ("Hr'g Tr.") 20-21. He fears that appointing Icahn Enterprises as

counterbalance. Even if Icahn Enterprises were ultimately deemed an unfit class representative, Handelsbanken would be unaffected.[33] Handelsbanken acquired its 63,200 shares pre-announcement.[34]

### 3. Other Matters

Differences in proposed fee structures are also an important consideration, as they bear directly on counsel's alignment with the class.[35] The Icahn/Handelsbanken

---

lead plaintiff will embolden merger arbs to buy large positions after a transaction is announced, receive cash at closing, and treat the litigation as a risk-free financial tactic. *Id.*

[33] The Icahn/Handelsbanken Group's co-lead plaintiff structure is another positive factor in this context. *See* Ct. Ch. R. 23(d)(4)(A)(v); *see also In re Emisphere Techs., Inc. S'holders Litig.*, 2021 WL 5815994, at *3 (Del. Ch. Dec. 6, 2021) (noting that a proposed lead plaintiff's conduct in unrelated litigation would have been disqualifying but for the fact that he was "one of several stockholders" in the group seeking a leadership role); *cf. Ryan v. Mindbody, Inc.*, 2019 WL 4805820, at *3 (Del. Ch. Oct. 1, 2019) (stating that a set of "hypothetical" conflicts in a leadership dispute "can be managed by counsel, and monitored by this Court, if they arise").

[34] Icahn/Handelsbanken Gp. Mot. Ex. A ¶ 8 (Joint Aff. of Ringvall and Lynn). At oral argument, Garcia's counsel stated that Handelsbanken's holdings amounted to only 0.002% of its portfolio, while Garcia's Endeavor shares were around 1% of his portfolio. Hr'g Tr. 22. This argument obscures the economic reality. For an institutional investor like Handelsbanken, even 0.002% of its portfolio translates into millions of dollars at risk. That absolute amount provides a powerful incentive to dedicate resources to this case. Though 1% may be a larger portion of Garcia's personal wealth, his total investment is trivial in absolute terms. The potential upside for Garcia is simply too small to rationally justify the effort needed to serve as an effective lead plaintiff in a suit of this scale.

[35] *See Endeavor*, 2025 WL 2049042, at *5; *see also* Ct. Ch. R. 23(d)(4)(A)(vii)-(viii); *cf.* Ct. Ch. R. 23(aa)(2) (requiring class representatives to affirm that they have not received or been promised compensation directly or indirectly, with specific exceptions).

Group has an advantage.[36]  It negotiated a fee cap of 22%, which serves as an early check on attorney self-interest and demonstrates that the plaintiffs are mindful of protecting the class from excessive fees.  This arrangement contrasts with the Garcia Group, whose proposal is silent on fee expectations, leaving the court without a corresponding assurance.

*          *          *

On balance, the Rule 23(d) factors weigh in favor of granting the Icahn/Handelsbanken Group's application.  Garcia's arguments cannot overcome the advantages of Icahn Enterprises and Handelsbanken's vast economic stakes.  Any problems with Icahn Enterprises' suitability to serve as class representative are mitigated by Handelsbanken, which provides an independent anchor for the leadership team.

This raises the question of whether Handelsbanken should proceed as sole lead plaintiff.  Although appointing Handelsbanken alone might streamline leadership and preemptively foreclose any challenges to Icahn Enterprises, I decline to take that step now.  The plaintiffs and their counsel are sophisticated parties who

---

[36] The advantage is not a decided one since the court retains the ultimate discretion to set an appropriate fee.

forged a strategic alliance. Early judicial intervention into their professional arrangement is unnecessary since Handelsbanken's presence protects the class. If circumstances warrant, the co-lead structure can be revised without major disruption.

## III. CONCLUSION

The Icahn/Handelsbanken Group's motion is granted. The Garcia Group's motion is denied.

Sincerely yours,

/s/ *Lori W. Will*

Lori W. Will
Vice Chancellor